## IN THE UNITED STATES BANKRUPTCY COURT FOR THE
## WESTERN DISTRICT OF MISSOURI

| | | |
|---|---|---|
| **In re:** | ) | |
| | ) | |
| **VANTAGE INVESTMENTS, INC.** | ) | **Case No. 04-046536-11-DRD** |
| | ) | |
| **Debtor.** | ) | |
| | ) | |
| | ) | |

_____

| | | |
|---|---|---|
| **VANTAGE INVESTMENTS, INC.** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **V.** | ) | |
| | ) | **Adversary No. 07-04076-DRD** |
| **LOC NGUYEN CORP. and** | ) | |
| **WWW ASSET TWO CORP.,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## MEMORANDUM OPINION

The matters before the Court are the objection of debtor Vantage Investments, Inc. ("Debtor") to Amended Proof of Claim No. 44 ("Objection") filed by WWW Asset Two Corporation ("WWW") and the claims asserted in Adversary No. 07-04076 ("Adversary"), filed by Debtor against WWW and a related entity, Loc Nguyen, Corp. ("LNC"). The Court has jurisdiction over this matter under 28 U.S.C. §§ 1334(b) and 157(a) and (b). This is a core proceeding which the Court may hear and determine pursuant to 28 U.S.C. § 157(b)(2)(B)( C) and (P). For the reasons set forth below, the Objection is sustained in part and overruled in part and Counts I, II, III, IV and V of the complaint in the Adversary are denied.

## I. FACTUAL AND PROCEDURAL BACKGROUND

On January 17, 2002, Debtor executed a promissory note payable to University National Bank ("UNB") in the amount of $2,932,500 ("Note") for the purchase of certain real property located at 5701 Longview Rd., Kansas City, MO 64137 ("Hotel Property").[1]  The Note was secured by a commercial deed of trust dated January 17, 2002 ("Deed of Trust").[2]  The Note was also secured by certain personal property described in the Deed of Trust and in a separate security agreement executed by the parties.   On August 15, 2003, the parties executed a modification and extension of the Note and Deed of Trust, wherein the amount of Debtor's debt was changed to $1,790,000.[3]

In August 2004, there was a fire in the kitchen of the Hotel Property which shut down the hotel's bar, restaurant and banquet room business.  Debtor's insurance carrier, Insurance Corp. of Hannover did not promptly pay Debtor's claim, which caused hotel profits to deteriorate.  On October 20, 2004, Debtor filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code.   On July 7, 2005, UNB filed Proof of Claim No. 44 in the amount of $1,769,229, plus an undetermined amount for attorney's fees.  Debtor's Second Amended Plan of Reorganization provided for a sale of the Hotel Property to occur on or before February 28, 2006.  Debtor's proposed sale did not close, and UNB's motion for an order to require Debtor to surrender possession of the Hotel Property, and allow UNB to proceed with foreclosure was granted on March 2, 2006.  UNB was in possession the Hotel Property and in control of running the hotel

---

[1] WWW's Exhibit A.

[2] WWW's Exhibit A.

[3] WWW's Exhibit B.

business operations until ownership was transferred to the successful bidder at the foreclosure

sale.  On or about May 5, 2006, UNB assigned the Note, Deed of Trust and all other related loan

documents to LNC for $2 million.[4]  On May 9, 2006, Scott Carter, as substitute trustee, at the

request of LNC, conducted a foreclosure sale of the Hotel Property.[5]   At the sale, LNC

submitted a credit bid of $2 million and the Hotel Propterty was sold to LNC for that amount.[6]

On November 20, 2006, WWW filed a Notice of Transfer of Proof of Claim No. 44 from

UNB to WWW.  Thereafter, WWW amended Proof of Claim No. 44 ("Amended Claim No. 44")

upward to include claims for real estate taxes, various repairs to the property and post-

foreclosure interest and attorney's fees for a total a deficiency request of $356,648.[7]  On

November 22, 2006, Debtor filed its objection to the Amended Claim No. 44.[8]  The Court heard

---

[4] WWW's Exhibit Q.

[5] WWW's Exhibit S.

[6] The deed issued after the foreclosure sale indicates that WWW was the purchaser of the
Hotel Property at the sale. Debtor's Exhibit #34.  The Court notes that there is a dispute
regarding whether LNC placed a credit bid at the sale and later sold the property and assigned
the Note to WWW or if WWW purchased the Hotel Property at the sale.  WWW and LNC are
two legally distinct entities that share a principal, Loc Nguyen.  At the time of the foreclosure,
LNC was the legal holder of the Note and the Deed of Trust.  Mr. Nguyen formed WWW on
May 9, 2006 at 12:03, two hours after Scott Carter conducted the foreclosure sale.  WWW's
Exhibit T.  The deed issued after the foreclosure, however, indicates that the purchaser at the sale
was WWW, a corporation which was not legally in existence at the time of the foreclosure sale.
The Court  will address this issue in the legal arguments section of the opinion.

[7] This figure is from the amended proof of claim filed by WWW in the case, however,
there is a mathematical error on the actual claim itself.  The claim suggests the total deficiency
request is $350,675.22.  There is another, different, itemized total claim for a deficiency found in
one of WWW's trial briefs.  The discrepancy in the requested deficiency, however, is ultimately
irrelevant as the Court will identify the precise portions and amounts of the deficiency claim that
will be allowed.

[8] UNB initially objected to the Amended Claim No. 44, but withdrew its objection on
April 3, 2007.  The Court entered an Order approving the transfer of Proof of Claim No. 44 from

testimony regarding the Objection on March 9 and April 5 and 6, 2007.

On April 18, 2007, Debtor filed the Adversary.  In the complaint, Debtor contends that it

is the owner of certain personal property, accounts, furniture, fixtures and trade fixtures,

equipment, inventory, supplies and general intangibles and instruments ("Personal Property")

related to the Hotel Property.  The primary issue raised in the Adversary is whether the Personal

Property was properly foreclosed and if not, the resulting implications, specifically, whether the

Personal Property was converted, whether there is a cause of action for breach of contract, or

breach of the Uniform Commercial Code, whether WWW and/or LNC is obligated to provide an

accounting and whether the lien on the property is void or voidable.  A trial was held on the

Adversary on June 28, 2007.  The Court took both the Objection and the issues raised in the

Adversary under advisement.

## II.  DISCUSSION AND ANALYSIS

Debtor's arguments against WWW's and LNC's right to assert a deficiency claim, as set

forth in the Objection and the Adversary are summarized as follows:

A) Debtor argues that neither WWW nor LNC has standing to assert a deficiency claim

against the Hotel Property because neither entity is the legal holder of *both* Amended Claim No.

44 and the underlying Note.  Debtor argues that LNC, which has never filed a claim in this

bankruptcy, remains the legal holder of the Note, while WWW, pursuant to a Court Order, is the

legal holder of Amended Claim No. 44, thus neither entity holds all the documents necessary to

assert an enforceable claim against the estate.

B) Debtor argues that WWW gets no deficiency under the so-called "no-notice-no-

_____

UNB to WWW on April 4, 2007.

4

deficiency" rule because the transfer of the Personal Property from LNC to WWW was not done in accordance with the notice provisions of Part 6 of Article 9 of the Uniform Commercial Code ("UCC").  Debtor also makes a claim for damages arguing that it did not overtly or by implication abandon the Personal Property, or consent to WWW's use or retention of the property, which was wrongful and constituted conversion.

C) Lastly, Debtor argues that any deficiency awarded should be limited to principal, interest and late fees, as properly calculated, certain costs and reasonable attorney's fees, less the $2 million received at the foreclosure sale.  WWW should not be permitted to include real estate taxes paid after the foreclosure sale, repairs made after the sale, or attorney's fees incurred after the sale.

### A. Applicable Law Regarding Objections to Proofs of Claim

Pursuant to 11 U.S.C. § 502, a proof of claim filed in a bankruptcy proceeding is deemed allowed unless a party in interest objects.  *Gran v. Internal Revenue Serv. (In re Gran)*, 964 F.2d 822, 827 (8th Cir.1992).  A properly filed proof of claim is prima facie evidence of the validity and amount of the claim. *Dove-Nation v. eCast Settlement Corp. (In re Dove-Nation)*, 318 B.R. 147, 152 (B.A.P. 8th Cir. 2004); *Consumers Realty & Dev. Co., Inc. v. Goetze*, 238 B.R. 418 (8th Cir.1999); Fed.R.Bankr.P. 3001(f).  The objecting party must produce evidence rebutting the claimant or else the claimant will prevail.  *Gran*, 964 F.2d at 827.  Once the objecting party produces evidence rebutting the claim, the burden of proof shifts to the claimant to produce evidence establishing the validity of the claim.  *Id.*  "Thus, once an objection is made to the proof of claim, the ultimate burden of persuasion as to the claim's validity and amount rests with the claimant." *Consumers Realty & Dev. Co., Inc.*, 238 B.R. at 423.

5

## B. Objections to Amended Claim No. 44

## 1. Standing

WWW filed Amended Claim No. 44 and Debtor objected.  Debtor asserts that WWW

and LNC lack standing to assert a claim because neither entity holds all the necessary documents

to file an enforceable claim.  LNC clearly cannot prevail because it has not filed a claim in this

bankruptcy.  Debtor contends that WWW also lacks standing because it only holds a claim, and

without the underlying documents to support that claim, its claim is neither valid nor

enforceable.  Debtor raised substantial legal issues, which were supported by sufficient evidence

to shift the burden of persuasion to WWW to establish (as to certain elements of the claim), by a

preponderance of the evidence, that it holds a valid and enforceable claim against Debtor for the

amount sought in Amended Claim No. 44.  There is no dispute that WWW is the legal holder of

Amended Claim No. 44 as that fact was established by Court Order.[9]  Similarly, there is no

dispute that, as of May 5, 2006,  LNC was the legal holder of the Note, Deed of Trust and related

loan documents pursuant to the assignment executed between UNB and LNC.[10]  The dispute here

centers on whether WWW has established that there was an assignment of the Note and related

loan documents from LNC to WWW such that it is the holder of both the claim and the

supporting documentation and thus has standing to assert Amended Claim No. 44.

There is no written assignment of the Note from LNC to WWW in evidence.  The

question then is whether there was an oral assignment.   The only evidence in the record of an

oral assignment is an affirmative response by Mr. Nguyen to a question by counsel for WWW

---

[9] Order entered April 4, 2007.

[10] WWW's Exhibit Q.

regarding whether there was an assignment of the documents.[11]    The Court notes the peculiarity

of the assertion that Mr. Nguyen, wearing his LNC principal hat, made an oral assignment, and

then quickly, switched hats to accept the assignment as a principal of WWW.    However, no

contradictory evidence was admitted and Debtor offered no legal authority for the proposition

that an oral assignment of a promissory note is invalid or that it is subject to certain conditions

which were not satisfied in this case.    The Court, therefore, finds that the Note was orally

assigned from LNC to WWW.    The Court, however, *specifically* makes no findings regarding

when the oral assignment occurred as there is no evidence in the record from which the Court

could make such a finding, a subject which is discussed in greater detail below.

### 2. Denial of Deficiency

### a. Failure to comply with Article 9 of the UCC

Debtor asserts that the Court should deny WWW a deficiency for non-compliance with

the UCC.    This argument fails for two reasons: (1) the "no-notice-no-deficiency" rule has not

been the law in Missouri since Revised Article 9 was enacted; and (2) Part 6 of Article 9 of the

UCC did not apply to the sale of the Personal Property in this case.

As discussed further below, the Court holds that Debtor is not entitled to deprive WWW

of a deficiency claim by reason of its purported failure to comply with the rules in Part 6 of

Article 9 of the UCC because they do not apply under the circumstances.    Even if they did,

Debtor's assertion that LNC's failure to comply with the notice provisions of Part 6

automatically deprives it of a deficiency claim is no longer the law.    The provision on remedies

was amended to replace the judicially created, "no-notice-no-deficiency," rule with a new series

---

[11] Transcript, August 5, 2007, p.159-60.

of presumptions and burdens of proof regarding a deficiency claim in a case where a secured

party failed to comply with Article 9. *See* Mo.Rev.Stat. § 400.9-626.   Rather than disallow the

deficiency claim in its entirety, the new statute creates a presumption that the proceeds of the

sale would be equivalent to the amount of the secured obligation, and imposes on the secured

party the burden of demonstrating what the amount of the recovery would have been had the sale

been in compliance with Article 9.   This provision legislatively overrules the previous

presumption of automatic disallowance of a deficiency claim on non-compliance. *See* Mo. Rev.

Stat. § 400.9-626.  When Revised Article 9 was enacted in 2001, it eliminated the "no-notice-no-

deficiency" rule that was established under the previous version of the Code. *See* 38 Mo. Prac.,

Mo. Foreclosure Manual § 4:11 (2007 ed.).

Debtor cites *Cherry Manor, Inc. v. Am. Health Care, Inc*., 797 S.W.2d 817 (Mo.

App.1990) as authority for its position that WWW may not receive a deficiency based on the,

now archaic, "no-notice-no-deficiency" rule.  In *Cherry Manor*, the creditor had a mixed

collateral bag of both personal and real property.  *Cherry Manor,* 797 S.W.2d at 819.  The debtor

defaulted on the note and the creditor foreclosed on the deed of trust covering the real property,

all in accord with applicable procedures.  *Id*.  Subsequently, the creditor re-sold the real property

and  foreclosed the personal property under Article 9 of the UCC, but neglected to send notice to

the debtor.  *Id*. at 820.  Under Missouri law, *at the time the case was decided*, failure to give

proper notice under the UCC snuffed out any deficiency for the creditor.  The problem with

Debtor's reliance on this case is that it was decided nearly ten years before Revised Article 9 was

enacted which specifically eliminated the "no-notice-no-deficiency" rule.  As noted, § 400.9-626

establishes a rebuttable presumption rule and eliminates the absolute bar to a deficiency when

there is a question of whether proper notice was given under Part 6 of Article 9.  However, the

point is moot given that WWW proceeded pursuant to § 400.9-604, which circumvents the need

to comply with the provisions of Part 6 of Article 9 when foreclosing personal and real property

together so long as the realty is properly foreclosed.

 In this case, the Personal Property was sold with the Hotel Property, as a mixed sale

pursuant to § 400.9-604(a)(2).  Therefore, because LNC opted to proceed under Missouri's real

estate foreclosure laws, Article 9 was inapplicable.[12]

 Section 400.9-604 states in relevant part:

(a) If a security agreement covers both personal and real property, a secured party may
proceed:

> (1) Under this part as to the personal property without prejudicing any rights with
> respect to the real property; or

> (2) As to both the personal property and the real property in accordance with the
> rights with respect to the real property, in which case the other provisions of this
> part do not apply.

Mo.Rev.Stat. § 400.9-604(a).

With respect to this subsection, the official comment of the UCC drafters states in part:

> The collateral in many transactions consists of both real and personal property.  In the
> interest of simplicity, speed, and economy, subsection (a), like former Section 9-501(4),
> permits (but does not require) the secured party to proceed as to both real and personal
> property in accordance with its rights and remedies with respect to the real property.

---

[12] The parties assume in the numerous briefs and pleadings filed in this case that Missouri
law applies to transactions involving both the real and personal property.  This is true with
regard to the Hotel Property as the Deed of Trust clearly states that Missouri law applies.  The
Court, however, acknowledges that the Note states that Kansas law applies to the Note,
therefore, presumably to any transactions involving the Personal Property.  The Court notes that
the potential discrepancy in applicable law is inapposite in this case because the law governing
the procedure for handling a security agreement which covers both real and personal property is
the same in both Kansas and Missouri.  *See* K.S.A. § 84-9-604.

Thus, § 400.9-604(a) gives the secured creditor whose collateral is partly personal and partly real, the choice of proceeding under Article 9 with respect to the personal property or proceeding under the real property laws as to both types of collateral, in which case the provisions of Part 6 of Article 9 would not apply.  Courts interpreting this statue have focused on whether there was a single document covering both real and personal property and whether creditors could choose to foreclose in separate actions under the UCC and real estate laws.[13]

WWW and LNC argue that the Deed of Trust secures both the Hotel Property and the Personal Property, thus they had the option to foreclose the properties together, pursuant solely to Missouri's real estate laws, which is what they did.  The Deed of Trust, which specifically secures the Hotel Property, also contains the following provision:

> 22. SECURITY INTEREST UNDER THE UNIFORM COMMERCIAL CODE.  This Deed of Trust shall be considered a financing statement and a fixture filing pursuant to the provisions of the Uniform Commercial Code . . . covering fixtures, chattels, and articles of personal property now owned or hereafter attached to or to be used in connection with the Property together with any and all replacements thereof, additions thereto, substitutions therefor and products thereof (the "Chattels"), and Grantor hereby grants Lender a security interest in such Chattels to secure payment and performance of the Obligations. ... Upon demand, [Debtor] shall make, execute and deliver such security agreements (as such terms is defined in said Uniform Commercial Code) as [UNB or its assigns] at any time may deem necessary or proper or required to grant to [UNB or its

---

[13] *See Van Egmond v. Horsman*, 10 P.3d 715, 717 (Colo. App. 2000) (Section 9-501(4) allows foreclosure of personal property as part of the real estate foreclosure proceedings, but did not apply in this case because there was not a single document covering both the real and personal property); *Interstate Elec. Supply Co. v. Contractors and Eng'rs, Inc.*, 515 N.E.2d 182, 186 (App.Ct.Ill.1987) (section 9-501(4) provides creditors with an option of proceeding in one action or two separate actions; in this case there were two separate documents covering the collateral, thus a mixed sale would not have been appropriate); *State Bank of Towner v. Hansen*, 302 N.W.2d 760, 764 (Sup.Ct. N.D.1981) (Court construed this subsection as providing a secured creditor, whose security encompasses both real and personal property, with the option of proceeding against all collateral in a single action in accordance with the real property laws. Creditor here chose to proceed in two separate actions, therefore Article 9 provisions applied to the foreclosure of the personal property.)

10

assigns] a perfected security interest in the Chattels...

This case, thus involves a Deed of Trust which secures both real and personal property and a security agreement which grants the lender a security interest in the personal property.[14] The Court finds that the Deed of Trust, which grants the holder a security interest in Debtor's real and personal property, constitutes the parties' security agreement, thus proceeding under § 400.9-604(a)(2) was proper.

Debtor admits that LNC could have foreclosed the real and personal property at the same time, but argues that that is not what occurred in this case. Rather, Debtor argues that LNC's failure to serve the "proper notice" and to observe the "statutory requirements" caused LNC to forfeit this legal remedy. This argument simply does not comport with either a legal or a common sense reading of § 400.9-604(a). The facts here are simple. LNC was the holder of a security agreement which secured both real and personal property, thus proceeding under Missouri's real estate laws was an option. If LNC chose to proceed under Missouri's real estate foreclosure laws, which it did, it was not also required to proceed down a parallel path to foreclose the Personal Property pursuant to the UCC. Therefore, because LNC chose to foreclose the Hotel Property and the Personal Property together, pursuant to Missouri's real

---

[14] A security agreement is defined as an agreement that creates a security interest. *Checkett v. Sutton (In re Sutton)*, 365 B.R. 900, 905 (8th Cir. 2007) *citing* Mo.Rev.Stat. § 400.9-102(a)(72). There is no requirement that a security agreement be denominated as such or have any particular form. *Id. citing In re Smith*, 167 B.R. 895, 897 (Bankr. E.D. Mo.1994). "All that is required under Article 9 for a document to be a security agreement is an objective manifestation in the language of the document of the debtor's agreement to grant a security interest in the collateral in favor of the creditor." *Checkett*, 365 B.R. at 905 *citing U. S. v. Mo. Farmers Assoc.*, 580 F.Supp. 35, 37 (E.D. Mo.1984) aff'd 764 F.2d 488 (8th Cir.1985) cert. denied 475 U.S. 1053, 106 S.Ct. 1281 (1986); *see also* Mo.Rev.Stat. §400.9-102, comment 3.b.

estate foreclosure laws, there was no need to give any notices pursuant to the UCC as Debtor

argues.

Debtor's reliance on *Cherry Manor* and *Bank of Dover v. Shipley*, 773 S.W.2d 825

(Ark.1989) as support for its argument that LNC did not foreclose the Hotel and the Personal

Property together is similarly unpersuasive as both cases are distinguishable on their facts.

Neither *Dover* nor *Cherry Manor* involved a single security agreement covering both real and

personal property.  There was not even an option in *Dover* or *Cherry Manor* for the lender to

choose to foreclose both real and personal property together, pursuant solely to real estate laws

versus the UCC, because in neither case was § 400.9-604(a) (or former § 400.9-501(4)) triggered

by the existence of a single security agreement covering both types of collateral.  In *Dover*, there

was a mortgage on the real property and a security agreement describing the personal property.

Because the lender foreclosed the mortgage and later sold the personal property without

providing the necessary UCC notice, under Arkansas law, it forfeited its  right to collect a

deficiency.  *Dover*, 773 S.W.2d at 454.   In *Cherry Manor*, there was a deed of trust on the real

property, a security agreement covering the personal property and a financing statement

perfecting the lender's lien on the personal property.  *Cherry Manor*, 797 S.W.2d at 819.  There

was a real estate foreclosure sale and a subsequent sale of the real estate and personal property

together, without any notice given to the debtor regarding disposition of the personal property.

*Id.* at 820.  As discussed previously, the Court denied the lender any deficiency under the "no-

notice-no-deficiency" rule, which was the law at the time the case was decided. *Id*. at 822.

Neither case involves facts similar to those here and the holdings are thus inapplicable.

Debtor next argues that because the Notice of Trustee's Sale did not specifically refer to

12

the sale of both the Hotel and the Personal Property, and because the substitute trustee did not

specifically mention the Personal Property when he called the foreclosure sale, LNC could not

have sold both the Hotel and the Personal Property together at the sale.  Debtor is either asking

the Court to ignore § 400.9-604(a) or to supplement it with an additional notice requirement,

neither of which the Court can or would do.  Not only does § 400.9-604(a) give LNC the option

to proceed with foreclosure of the Personal Property without compliance with the UCC, but in

this case, all the parties knew the Personal Property was part of the deal.

There is ample evidence to support the Court's finding that all parties believed the Hotel

and Personal Property were being sold as a package deal.   The evidence is that the Hotel

Property was sold (or a credit bid was submitted) at the foreclosure sale for $2 million.  The

Deed of Trust itself includes in the definition of "Property" not only the real estate, but

"machinery, equipment, building materials and goods" used in connection with the real property

whether affixed to the land or not.  Before the foreclosure, the Hotel Property was being

marketed on the internet as an operating business.  The transfer of ownership of the Hotel

Property was seamless in that the business never closed its doors and at all times operated as a

going concern, open to the public. The Hotel Property Certificate of Value, which was prepared

by the substitute trustee and filed in Jackson County, Missouri, reflects that there was "personal

property", specifically "hotel property and equipment" included in the sale price.[15]  During the

eleven months from the date ownership was transferred to WWW at the foreclosure sale, to the

date the Adversary was filed, Debtor never once objected to WWW's use and possession of the

Personal Property.  In fact, a representative of Debtor even stayed at the hotel on at least two

---

[15] Debtor's Exhibit #52.

13

occasions after the foreclosure sale and did not object to the presence of, or use of the Personal

Property.   The Court is more than convinced that all parties to this transaction acted as though,

and believed that the Hotel and the Personal Property were sold together at the foreclosure sale

as a package deal.   These facts, in addition to the law which specifically allows LNC to foreclose

both the Hotel and Personal Property together, without compliance with Part 6 of Article 9 of the

UCC, support the Court's finding that the Personal Property was legally foreclosed, pursuant to

§ 400.9-604(a)(2) and relevant Missouri real estate laws, at the May 9, 2006 foreclosure sale.

### b. Absence of Good Faith

Debtor argues that the foreclosure sale was not an arms-length transaction and that the

Court should disallow the deficiency on the basis of bad faith.   Debtor's argument is that the

Hotel Property was worth more than the $2 million bid by WWW, that WWW knew the amount

that was due UNB under the loan as of the foreclosure, and that WWW worked in collusion with

its related entity LNC to set the bid low at the foreclosure sale so as to artificially create a

deficiency.   As WWW points out, Debtor cites no legal authority to support its contention that

denial of a deficiency claim can be based on bad faith, nor does 11 U.S.C. § 502 provide grounds

for disallowance of a claim on that basis.   The mortgagee is under no obligation to bid at a

foreclosure sale let alone to bid any particular amount.   *Boatmen's Bank of Pulaski County v.*

*Wilson*, 833 S.W.2d 879 (Mo. App. S.D.1992).   Absent evidence of fraud or unfair dealing, the

price for which the property is sold establishes its value and provides the basis for measuring the

deficiency owed by the mortgagor.   *Regional Inv. Co. v. Willis*, 572 S.W.2d 191 (Mo.

App.1978); *Drannek Realty Co. v. Nathan Frank, Inc*., 139 S.W.2d 926 (Mo. App.1940).

Inadequacy of price may be considered but absent other evidence is not itself a sufficient ground

14

for setting aside a sale under a deed of trust. *Drannek*, 139 S.W.2d at 928. That stated, the facts

do not support a finding of bad faith. LNC purchased the Note and the Deed of Trust from UNB

for $2 million the day before the foreclosure sale. At least one commercial real estate appraisal

valued the Hotel Property as of the sale date as having a fair market value of less than $2

million.[16] The only other bid at the sale was for $700,000. The Court is convinced that the $2

million bid placed at the foreclosure sale was a fair and reasonable bid and was submitted in

good faith.

### 3. Objections to Specific Components of Amended Claim No. 44–Taxes and Repairs

WWW asserts that it is entitled to include as part of its deficiency claim $124,271.63 for

real estate taxes paid after the foreclosure and $90,655.00 for fire damage repairs made to the

Hotel Property after the foreclosure. WWW argues that its right to collect these amounts stems

from certain provisions of the Note and Deed of Trust. Debtor argues that WWW should not be

allowed any deficiency, but that if it is, the Court should limit it to principal, interest and late

fees, as correctly calculated, certain costs and reasonable attorney's fees, less the bid accepted at

the foreclosure sale of $2 million. Debtor argues that WWW should not be allowed to include as

part of its deficiency claim real estate taxes paid after the foreclosure sale or expenditures made

to repair the property after sale.

Debtor argues that, because the deed of trust issued by the substitute trustee after the

foreclosure sale (the "Substitute Trustee's Deed") indicates that WWW was the purchaser of the

Hotel Property at the sale, that the doctrine of estoppel by deed prohibits the parties from

asserting any facts contrary to what is memorialized in the writing. Debtor argues that there was

---

[16] WWW's Exhibit FF.

no assignment of the Note and related loan documents, and that, as the purchaser of property at a foreclosure sale, WWW took the property "as is", that the rules of caveat emptor apply, and WWW may not seek reimbursement for any expenditures allegedly recoverable under a loan document which it does not hold.  As Noted, the Substitute Trustee's Deed recites that the purchaser at that sale was WWW.  WWW sought to introduce evidence that, notwithstanding the recitation in the Substitute Trustee's Deed, and the granting clause, that the bid made at the foreclosure sale was a credit bid by LNC.  In support, WWW cited the fact that no funds were paid to the trustee as would have been required of a third-party purchaser and that WWW was not created until after the foreclosure sale.  Debtor objected, arguing that the doctrine of estoppel by deed prohibits the introduction of evidence that would contradict the recitation in the Substitute Trustee's Deed or any attempt to establish that the purchaser was other than WWW. The Court took the evidence subject to objection, which it took under advisement.

Debtor objects to the evidence in order to preserve its argument that if WWW acquired the Hotel Property by purchase at the foreclosure sale, and did not obtain an assignment of the Note, its payment of the real estate taxes and incurring of expenses to make repairs on the property could have been done only in its capacity as a purchaser.  The Court agrees that, in that capacity, it would be unable, under the doctrine of caveat emptor, to recover for those expenditures.  *In re Newby*, 344 B.R. 597, 601 (Bankr. W.D. Mo.2006); *Michie v. Nat'l Bk of Caruthersville***,** 558 S.W.2d 270 (Mo. App.1977). The point is probably moot.  The Court has determined that WWW introduced uncontroverted (albeit scant) evidence that it took an oral assignment of the Note and Debtor has offered no legal authority negating the validity of the assignment.  In addition, the Court has determined that notwithstanding that WWW may have

16

acquired the capacity of note holder, it is for other reasons not entitled to recovery for the real estate taxes paid and repairs made.

Even so, the Court determines the doctrine of estoppel by deed is not applicable in this context.  First, the authorities cited by Debtor, for example, *Maple Tree Inv., Inc. v. Port*, 821 S.W.2d 562 (Mo. App.1991), declare that the doctrine binds the grantor to the statements contained in the deed.  Here, it is not the grantor, the successor trustee, but the grantee that seeks to contradict the recitation in and effect of the deed.  Nor does any authority cited by Debtor indicate that the doctrine may be invoked by a stranger to the document, such as Debtor.  Secondly, as the authorities cited by Debtor and other cases indicate, the doctrine of estoppel by deed is a species of estoppel and requires that some detrimental reliance and damage be demonstrated.  *Board of Managers of Heatherton Homeowners Ass'n v. First Capitol Oil Co.*, 798 S.W.2d 176 (Mo. App. E.D.1990).  Debtor offers no evidence that it changed its position in some way based on the recitation in the Substitute Trustee's Deed  or the conveyance of the Hotel Property to WWW or that it has been injured or damaged in some way as a result of either.

### a. Timing of Assignment and Advances

The Court denies WWW's request to include in its deficiencyclaim money expended after the foreclosure to pay  past due real estate taxes and to repair fire damage to the Hotel Property.   The Court finds that there is no credible evidence from which it could conclude that WWW was the legal holder of the Note, or any of the loan documents, at the time the real estate taxes were paid or when expenditures were made to pay for repairs to the Hotel Property. While there is enough unrebutted evidence to support a finding that an oral assignment occurred, there

is insufficient evidence for the Court to make any additional findings regarding the assignment. Critically, there is no evidence regarding when the assignment occurred.

WWW's argument that all the evidence points to the "logical conclusion" that an assignment of the Note from LNC to WWW took place immediately after the foreclosure sale is unsupported by the evidence. Specifically, WWW argues that had an oral assignment not taken place between the two corporations at that time, the Substitute Trustee's Deed would not have reflected WWW as the purchaser at the foreclosure sale. WWW also asked the Court to consider Mr. Nguyen's testimony in the context of his limited English language capabilities, and argues that its contention that the loan documents were assigned from LNC to WWW immediately after the foreclosure sale was corroborated by the testimony of Scott Carter, UNB's legal counsel and the substitute trustee. WWW was apparently formed to own and operate the Hotel Property. It does not "logically" follow, however, that it was also necessarily created to also hold the Note. Accordingly, the fact that the Substitute Trustee's Deed conveyed the property to WWW, despite the fact that LNC actually purchased the property with a credit bid at the foreclosure sale, says nothing about when an assignment of the Note may have occurred.

The Court acknowledges, having listened to the testimony, Mr. Nguyen's limitations with the English language. The Court must, however, decide the matter based on the record before it and cannot speculate as to what the evidence might have been if Mr. Nguyen had a better understanding of the English language or had been better prepared to testify as a witness. Finally, although Mr. Nguyen did testify that he informed Mr. Carter that he "ultimately" wanted WWW to own the Hotel Property and hold the Note, there is no evidence as to when that conversation occurred. Contrary to WWW's assertion, Mr. Carter's testimony does not confirm

18

Mr. Nguyen's testimony about an assignment of the Note.  He testified only that he was made aware of the fact that WWW was to be formed to hold the title to the Hotel Property and be the operator of the property.  That conversation explains why the Substitute Trustee's Deed was issued to WWW.  The Court finds it unlikely that there was ever a conversation between Mr. Nguyen and Mr. Carter regarding the assignment of the Note.  Had there been such a conversation, undoubtedly it would have been for the purpose of having Mr. Carter prepare a written assignment of the Note from WWW to LNC, which never occurred.

Based on the evidence, or lack thereof, and the Court's belief that those involved simply overlooked the need to have actual evidence of an assignment of the Note, the Court cannot find that WWW was the legal holder of the loan documents *at the time* the real estate taxes were paid or expenditures were made to pay for the fire damage repairs.  Based on the facts in evidence, LNC could theoretically have orally assigned the Note to WWW while walking into the courtroom the morning of the trial.   For these, and other reasons described herein, the Court denies WWW's request to add the real estate property taxes and fire damage repairs to Amended Claim No. 44.

**b. Obligation of Debtor to Discharge Taxes and Make Repairs Under Loan Documents**

Even if WWW were able to establish that it had been assigned the Note prior to paying the taxes and repairs, the language in the Note and Deed of Trust do not support recovery of expenditures made related to preservation of the value of the property or a right to pay for repairs and be reimbursed after the conclusion of the foreclosure sale.   A promissory note is an unconditional promise in writing made by one party to another, signed by the maker, engaging to pay on demand, or at a fixed or determinable future time, a sum of certain money, to order or to

bearer.  *Hemar Ins. Corp. of Am. v. Ryerson*, 108 S.W. 3d 90 (Mo. App.2003).  The purpose of a

deed of trust is to convey title to real property to a trustee, to hold in trust, as security until the

debtor repays the loan.  *In re Burche*, 249 B.R. 518 (Bankr. W.D. Mo.2000).

 WWW repeatedly asserts that the Note incorporates certain obligations of the Deed of

Trust with regard to payment of taxes, preserving the property against liens, keeping the property

in good repair and not committing waste.  Examination of the documents, however, reveals that

this is an overstatement of the nature and effect of their provisions.  The Note simply

incorporates as events of default Debtor's failure to abide by certain obligations of the Deed of

Trust.  Accordingly, if Debtor fails to pay taxes when due, or fails to repair the property, any

such failure would constitute an event of default, entitling the holder of the Note to declare a

default, accelerate the amounts due and take actions to recover that amount, including but not

limited to, foreclosure of the Deed of Trust.  Those provisions do not, however, create

affirmative obligations on the part of Debtor to pay the taxes, pay for needed repairs, make those

amounts part of the indebtedness or authorize the holder of the Note to recover any such

amounts.

 Accordingly, the Note offers no basis for WWW to recover the unpaid real estate taxes or

costs of repair.  WWW specifically disclaims any reliance on the provisions of the Deed of Trust

as authority for its claim.  Even were the Court to consider the provisions of the Deed of Trust,

which does include provisions imposing obligations on Debtor to maintain the property free of

liens and take actions and make repairs to maintain the property in good condition, the Court is

convinced that those obligations have no continuing vitality subsequent to the foreclosure sale.

As noted above, the purpose of a deed of trust is to secure an indebtedness.  The purpose of

certain provisions in a deed of trust is to preserve the value of the property as collateral for the

unpaid balance of an obligation. After a foreclosure sale, property subject to a deed of trust, no

longer stands as security. Here, although the holder of the Note could have advanced the

property taxes or effectuated the repairs prior to the foreclosure sale and recovered those

advances, it did not do so. The Note holder had the opportunity at the foreclosure sale to protect

itself by adjusting its bid at the sale. The evidence is clear that LNC was well aware of the

unpaid taxes and of the condition of the Hotel Property prior to the foreclosure sale. WWW

claims that LNC did not take the condition of the property into consideration in making the bid.

The Court finds this difficult to believe. However, even if the assertion is taken at face value,

while LNC may not have done so, it could have and should have. Moreover, as WWW and LNC

argue in response to Debtor's bad faith argument, the amount bid for the Hotel Property at the

sale establishes its value. WWW is therefore not free to argue at this point that the Hotel

Property had a value less than the amount bid at the sale.

WWW also argues that Debtor committed waste by failing to repair the property and is

thus liable for the repairs regardless of whether the sums were expended before or after the

foreclosure sale. Missouri courts have, however, held that the foundation of a right to sue for

waste is impairment of the value of the security. *Randolph v. Simpson*, 500 S.W.2d 289 (Mo.

App.1973); *see also Restatement (Third) of Property: Mortgages*, § 4.6(b)(1997). A covenant

contained in a mortgage to maintain and keep the mortgaged premises in good repair merely

furnishes collateral security for the performance of the underlying debt and has no independent

existence apart from being collateral for the underlying debt." *Raneri v. Inn America of

Pennsylvania, Inc.*, 1984 WL 300 (Pa. Com. Pl.1984). Impairment of the security is no longer an

issue subsequent to the foreclosure sale at which point there is no longer a security to be
impaired.

WWW's authorities in support of the proposition that real estate taxes paid after a
foreclosure sale are recoverable by a purchaser pursuant to a promissory note and deed of trust
are completely distinguishable on the facts. *In Vista Dev. Joint Venture II v. Pac. Mut. Life Ins.
Co.*, 822 S.W.2d 305 (Tex. App.1992), the purchaser of the property at the foreclosure sale relied
upon a specific exception to the nonrecourse language of the loan which allowed the holder of
the note to recover from the maker of the note  "amounts required to satisfy any taxes...which
were due but not paid by Maker". *Vista*, 822 S.W.2d at 307.  Similarly, in *Weinstein v. Park
Funding Corp.*, 879 P.2d 462, 466 (Colo. App.1994), there was a specific provision which held
the maker personally liable for "any and all liability which holder may incur resulting from the
imposition of any liens which result from the actions of maker... that may be imposed upon all or
any portion of the tract conveyed to maker...if said liens have...priority over the Deed of Trust
given by maker."   Clearly, it was the intention of the parties to the loan documents relied on in
*Vista* and *Weinstein* that the holder of the notes would have personal recourse against the maker
if taxes were due and unpaid at the time of a foreclosure.  Such is not the case here.  Neither the
Note or the Deed of Trust in this case contain provisions which purport to grant WWW recourse
against Debtor for any liabilities resulting from the purchase of the Hotel Property.

Actually, the facts make this case more like those cited by Debtor in which recovery for
unpaid taxes incurred or waste committed prior to foreclosure sale were denied.  *See Randolph,*
500 S.W.2d at 292 (court denied recovery for waste noting that the plaintiff purchased the real
property at a trustee sale at her own risk with respect to the effect of any waste on the condition

and market value of the property, that the amount paid for the property at the sale constituted the basis for determining the amount of the deficiency judgment and denying recovery for damages for waste as well as a deficiency on the ground that permitting both would constitute a double recovery); *see also Hoffman v. Stelbrink*, 58 Mo. App. 662 (1894) (denying recovery on bond of administrator of estate on claim of breach of duty for failing to pay taxes brought after foreclosure sale had occurred and holding that the right of mortgagee to protect itself in the payment of delinquent taxes must be asserted before foreclosure of the mortgage).

### 4. Estoppel/Amendment of Claim No. 44

Even if WWW could establish that it was the holder of the Note at the time the real estate property taxes were paid and the expenditures for the repairs were made, and it could persuade the Court that the language in the Note or the Deed of Trust establishes an independent obligation on the part of Debtor to pay these amounts, the Court finds that the equities do not favor an amendment to the claim to include these sums. Debtor argues both that WWW should be bound by the calculation of the amounts due pursuant to Debtor's Exhibit #25, which was provided to Debtor at the foreclosure sale, and that it should not be permitted to amend the proof of claim originally filed by UNB, of which it took an assignment, to include the additional amounts paid for taxes and repairs. According to Debtor's Exhibit #25, as of the foreclosure sale, the amount due UNB was $2,126,403.59. Debtor contends WWW should be estopped from seeking an amount different than that, and that the deficiency claim should be fixed by that amount, with a credit for the sum bid at the sale. Debtor offers no legal authority for the proposition that the holder of a note, secured by a deed of trust, is bound by a calculation of the obligation due as of the foreclosure sale. The *Drannek* Court*, supra*, rejected similar arguments

of waiver and estoppel by a mortgagor seeking to defend against a deficiency judgment.  In

*Drannek*, the claim was based on an alleged promise not to seek a deficiency judgment.

*Drannek*, 139 S.W.2d at 929.  Although the court was not persuaded that such a promise had in

fact been made, evaluating the communications between the mortgagor and the mortgagee, it

also concluded that the evidence did not establish a waiver of the mortgagee's right to assert a

deficiency or that it should be estopped from doing so. *Id*.  Similarly, in this case, the mere

provision of an amount due on the date of the foreclosure is not an unequivocal indication of the

lender's intention to abandon a deficiency or any particular claim that might comprise the

deficiency.  Neither is there any evidence that Debtor's conduct at or immediately prior to the

foreclosure sale would have been different or that it otherwise relied on this information in that

context.

In this case, there is no evidence that WWW waived its right to, or should be estopped

from, pursuing a deficiency.  The question is whether and to what extent WWW should be

allowed to amend its deficiency claim to include amounts not included in the proof of claim

originally filed by UNB.   UNB's original proof of claim ultimately included a total deficiency

amount of $111,347.91.[17]  After taking an assignment of that claim, WWW seeks to amend the

deficiency claim upward to the amount of $356,648, more than three times the amount sought by

UNB, a primary difference being the inclusion of claims for recovery of the property taxes paid

and costs of repairs effectuated.  While the Court is not willing to hold WWW to an amount

identified on the day of foreclosure as being due, the Court finds that equitable factors weigh

---

[17] UNB's claim is comprised of attorney's fees of $109,797.91, an appraisal fee of
$1,200, and a title report fee of $350.00.

against allowing WWW to increase the deficiency to include the amounts sought in Amended

Claim No 44.

"It is well settled that the decision to allow an amendment to a timely filed claim is

within the sound discretion of the Court." *In re Wrenn Ins. Agency of Mo., Inc.*, 178 B.R. 792,

798 (Bankr. W.D. Mo.1995).  "As a general rule, 'amendment to a claim is freely allowed where

the purpose is to cure a defect in the claim as originally filed, to describe the claim with greater

particularity or to plead a new theory of recovery on the facts set forth in the original claim'." *Id.*

When determining whether a proposed amendment to a proof of claim would be equitable,

important factors to be balanced by the court include: 1) undue prejudice to the opposing party;

2) bad faith or dilatory behavior on the part of the claimant; 3) whether other creditors would

receive a windfall if the amendment is not allowed; 4) whether other claimants might be harmed

or prejudiced by the amendment; and 5) the justification for the inability to file the amended

claim at the time the original claim was filed. *Id. citing In re McLean Indus., Inc.*, 121 B.R. 704,

708 (Bankr. S.D. N.Y.1990).

Initially, it is unclear if WWW's proposed amendment to the proof of claim qualifies as

one which should be freely permitted under the language above.  It was not made to cure a defect

in the claim, to describe the claim with greater particularity or even to plead a new theory of

recovery on facts set forth in the original claim.  It is based on entirely new facts, for different

elements of recovery, predicated upon entirely distinct theories of obligations, allegedly imposed

by language in the Note and Deed of Trust with regard to keeping the property free of

encumbrances and maintaining it in proper repair.

Assessing the equitable factors, the Court finds they weigh heavily against permitting

25

WWW to amend its deficiency claim to include amounts paid after the foreclosure for real estate
taxes and fire damage repairs.  As previously stated, Debtor's Exhibit #25 is the calculation of
outstanding debt which was given to Debtor's counsel, Mr. Gaines, at or around the date of the
foreclosure.   The evidence is that Debtor relied on Exhibit #25 in the negotiations and ultimate
settlement with Hannover and that Debtor relied on it with the ultimate settlement of the claims
with the other creditors.[18]  Although Debtor, or its counsel, were aware that WWW may have
intended to assert a deficiency claim, the first time Debtor was made aware that WWW intended
to include real estate taxes and expenditures made for repairs as part of the deficiency claim was
in November 2006, approximately a month after Debtor settled the Hannover litigation and
nearly six months after WWW took possession of the Hotel Property.[19]  WWW has made no
attempt to explain the reason for the delay in amending its claim to disclose what amounts to
almost triple the figure Debtor suspected it would be asked to pay as the deficiency.

LNC knew prior to the foreclosure sale that real estate taxes for at least two prior years
had not been paid.  It either knew the amount of those taxes or could easily have ascertained
them by inquiring of the tax authorities.  It also had access to the Hotel Property and took
advantage of the opportunity to inspect its condition prior to acquiring the Note.  Although it
undoubtedly took some time to arrange and pay for the repairs, the costs could have been
estimated shortly after WWW acquired ownership of the Hotel Property and began to operate it.
WWW knew that Debtor was still in settlement negotiations with Hannover.  According to the
testimony of Mr. Gains, the amount of the filed claims was an element of the damages claimed

---

[18] Transcript, March 9, 2007, p. 97-98; p.165-166.

[19] Transcript, March 9, 2007, p. 99.

and a factor in the negotiations with Hannover.  Mr. Gaines also testified that as a part of that

process, and in order to effectuate the settlement, his firm compromised its fees.  Had Debtor

known that WWW planned to amend its claim  to include taxes and repairs, it may have changed

its position in the Hannover settlement.  For all of these reasons, the Court finds that it would be

inequitable for WWW to be allowed to increase its claim to include the amounts sought for taxes

and repairs in Amended Claim No. 44.

### 5. Late Fees/Attorney's Fees/Interest

As noted previously, because of a mathematical error in the amended proof of claim filed

in this case and a different calculation contained in WWW's post-trial brief, there exists some

discrepancy regarding the precise amount WWW is seeking as its deficiency claim.  This

discrepancy is inapposite, however, because the Court will clarify the precise amounts that it will

allow and disallow.  The claims for real estate taxes advanced and repairs to the property are

disallowed as discussed above.  The Court understands that the unpaid principal in the amount of

$1,763,036.45, an appraisal fee of $1,200, a title report fee of $350 and publication fees of $275

are undisputed.  The remaining disputed issues are the late fees, the attorney's fees, and the pre

and post-foreclosure accrued and unpaid interest.

### a. Late Fees

Included in Amended Claim No. 44 is WWW's claim of $21,278.18 for late fees.

WWW's calculation is based on a provision in the Note which states:

> If a payment is received more than 10 days late, Borrower will be charged a late charge
> of $25.00 or 5.00% of the unpaid payment, whichever is greater.

Debtor argues that the amount of late fees should be limited to $2,800.  Although the

basis for the argument is unclear, Debtor's contention is that WWW, as UNB's assignee, is

bound by the contents of the monthly bank statements sent to it by UNB.  Debtor asserts that the

late fee should be limited to $100 per late payment because that is the amount it was being

charged in the statements it received from UNB.[20]  Debtor appears to be contending that the Note

was modified, or that WWW waived its right to claim late fees pursuant to the Note, or is

estopped from collecting late fees under the Note.  The Note states that any and all modifications

or waivers must be in writing and signed by the lender.[21]  No evidence was introduced indicating

that there was a written modification of the Note.  Nor was there any written evidence of a

waiver.  The only question is whether there is sufficient evidence of an implicit waiver for the

Court to find that UNB intended, through its actions, to relinquish its right to collect late fees

pursuant to the Note.

 Waiver is the intentional relinquishment of a known right.  *Luck "E" Strike Corp. v. First

State Bank of Purdy*, 75 S.W.3d 828, 832 (Mo. App.2002) *citing Brown v. State Farm Mut. Auto

Ins. Co.*, 776 S.W.2d 384, 386 (Mo. banc 1989).  A waiver may be made expressly or may be

implied from conduct.  *Id. citing Mark Twain Bank v. Jackson*, 901 S.W.2d 360, 363 (Mo. App.

W.D.1995).  For a waiver to be implied from conduct, the conduct must clearly and

unequivocally show a purpose to relinquish the right. *Id. citing Heintz v. Swimmer*, 811 S.W. 2d

396, 399 (Mo. App. E.D.1991).  "To rise to the level of a waiver, ...actions must be so manifestly

consistent with and indicative of an intention to renounce a particular right or benefit that no

other reasonable explanation of the conduct is possible." *Id*. at 833 *citing Waterwiese v. KBA

---

[20]Debtor's Exhibit #46.

[21] Debtor's Exhibit #31, ¶ 5.

28

*Constr. Managers, Inc*., 820 S.W.2d 579, 585 (Mo. App. E.D.1991).[22]   In *Luck "E" Strike*, the

issue was whether the lender implicitly waived its right to collect late fees pursuant to the

agreement.   As in this case, the *Luck "E" Strike* loan agreement required all waivers to be in

writing and signed by an officer of the lender.   Because there was no evidence of a written

waiver, the Court considered the lender's conduct.   The implicit evidence of waiver in *Luck "E"*

*Strike* included modification agreements which did not specifically reference the late fees,

information provided to the borrower's auditor which did not include a late fee balance and

specific testimony regarding a lender officer "taking care of the late fee problem".   *Id*. at 833.

The *Luck "E" Strike* Court found that the lender's conduct did not rise to the level of intentional

relinquishment of its right to collect late fees pursuant to its agreement. *Id.*   In this case, the only

evidence of an implicit waiver is UNB's monthly statements mailed to Debtor with the $100 late

fee per late payment.   A UNB representative testified that the bank system automatically accrues

late charges at $100 per late payment by default, but that the Note controls the actual amount

due.   The Court finds that UNB's conduct is insufficient to support a finding of implicit waiver.

　　　Estoppel requires proof of (1) an admission, statement, or act inconsistent with the claim

afterwards asserted and sued upon, (2) action by the other party on the faith of such admission,

---

[22] The Court notes that the potential discrepancy in applicable law is inapposite regarding the issues of waiver and equitable estoppel because the law appears to be substantially similar in both Kansas and Missouri.  *See Lyons ex rel. Lawing v. Holder*, 163 P.3d 343 (Kan. App.2007) (waiver is the intentional relinquishment of a known right and is a voluntary act; waiver must be known and intentional and intent may be inferred from conduct); *see also Shaffer v. City of Topeka.,* 57 P.3d 35 (Kan. App.2002) (The requirements for a claim of equitable estoppel are: (1) the party to be estopped must know the facts; (2) the party to be estopped must intend that his conduct shall be acted on or must so act that the party asserting the estoppel has a right to believe it is so intended; (3) the party asserting the estoppel must be ignorant of the true facts; and (4) the party asserting the estoppel must rely on the other's conduct to his injury.).

statement, or act, and (3) injury to such other party, resulting from allowing the first party to

contradict or repudiate the admission, statement, or act.  *Brown*, 776 S.W.2d at 386.  As with

waiver, there is no evidence to support a finding of equitable estoppel.  The only evidence of an

admission, statement, or act that could even conceivably be construed as inconsistent with

WWW's late fees claim, are the monthly statements that UNB sent to Debtor which contained

the automatically generated $100 late fee per late payment.  However, the Court finds this

evidence weak.  Without additional evidence of reliance by Debtor on the monthly statements,

and injury to Debtor because of its receipt of the statement which contained inaccurate

information regarding the late fees and reliance thereon, the Court cannot find that WWW should

be estopped from collecting late fees pursuant to the terms of the Note.  The Court finds that

neither WWW nor its predecessor intentionally relinquish the right to collect late fees pursuant

to the Note and that there is no evidence from which the Court could find a basis to prohibit

enforcement of the terms of the Note based on equitable estoppel.  The Court will overrule this

portion of Debtor's objection to Amended Claim No. 44 and allow late fees as claimed in the

amount of $21,278.18.

### b. Attorney's Fees

### i. Applicable Law Regarding Attorney's Fees

Federal courts follow the "American Rule" which requires the parties to bear the expense

of their own attorney's fees unless they are provided by statute or contract.  *Travelers Cas. and*

*Sur. Co. of Am. v. Pac. Gas and Elec. Co.,* 127 S. Ct. 1199, 1200, 167 L.Ed.2d 178 (U.S. 2007);

*In re Woods Auto Gallery, Inc.*, 379 B.R. 875, 883 (Bankr. W.D. Mo.2007).  In this instance,

there is contractual authority for recovery of attorney's fees and collection costs by WWW.  The

relevant provisions contained in the Note obligate Debtor to pay the lender's reasonable costs and fees incurred in "collecting any amount due or enforcing any right or remedy under this Note."[23]

Pursuant to 11 U.S.C. § 506(b), a secured creditor is entitled to augment its claim by fees, costs and charges incurred if they are reasonable in amount and provided for by the agreement under which the claim arises. *U. S. v. Ron Pair Enter., Inc.*, 489 U.S. 235, 241 (1989). In order to recover attorney's fees, a secured creditor must establish that: (1) it was secured by property

---

[23] Debtor's Exhibit #31.

of a value in excess of the amount of the claim;[24] (2) the requested fees are reasonable; and (3)

the agreement giving rise to the claim authorizes the recovery of the fees.  *White v. Coors*

*Distrib. Co. (In re White)*, 260 B.R. 870, 880 (B.A.P. 8th Cir. 2001); *In re Spidel*, 207 B.R. 882,

885 (Bankr. W.D. Mo.1997).  In determining the reasonableness of the fees, the court must

consider whether the actions taken were reasonable and prudent in the circumstances in

protecting the creditor's interest in the collateral and whether the amounts sought for the services

performed are reasonable.  *White*, 260 B.R. at 880; *In re Cushard*, 235 B.R. 902, 906-07 (Bankr.

---

[24] It is unclear whether UNB was oversecured.  Interestingly, the positions of the parties
and the evidence introduced by them on valuation are contrary to their interests on this aspect of
the creditor's right to augment its secured claim by the amount of its attorney's fees and
expenses.  That is likely a result of the fact that the same valuation evidence has different
implications for the parties' positions on other issues in this case.  Debtor introduced evidence
tending to indicate that the value of the Hotel Property might be as much as $2.8 million, while
WWW introduced appraisal testimony pegging the value of the Hotel Property at less than $2
million.  The value of the Personal Property varies widely depending upon the standard and
methodology of valuation employed. In addition, UNB held a security interest in the lease of the
cell phone tower and the rents generated from that arrangement.  WWW also asserts that it has
an interest in the proceeds of the claim against Hannover, although that issue has not been
conceded or litigated.  Of course, the amount bid at the foreclosure sale was $2 million.
Accordingly, WWW has not demonstrated that it is entitled to recovery of fees and expenses as
an additional component of its allowed secured claim.

   This raises the question whether an undersecured creditor can recover attorney's fees
incurred post-petition as an unsecured claim or whether they should be disallowed.  The courts
have reached conflicting conclusions on this issue, although a majority of courts appear to
disallow claims not meeting the qualifications of § 506(b).  *See* Jennifer Taylor and Christopher
Mertens, *Travelers and the Implications on the Allowability of Unsecured Creditors' Claims for
Post-Petition Attorneys' Fees Against the Bankruptcy Estate*,  81 Am. Bankr. L.J. 123, 151 n.
202 and accompanying text (2007). However, this Court need not decide whether WWW is or
needs to be oversecured to recover attorney's fees in this instance.

   A number of courts have held that notwithstanding these limitations, secured creditors
may be entitled to recover attorney's fees if the estate is solvent.  *In re Carter*, 220 B.R. 411
(Bankr. D.N.M. 1998); *In re Gaines*, 178 B.R. 101 (Bankr. W.D. Va. 1995).  In this case, Debtor
is clearly solvent, having already made distributions paying its unsecured creditors in full with
the remaining funds to be paid to discharge some additional attorney's fees of Debtor's counsel
and the rest to be paid either to WWW or returned to Debtor or both.

W.D. Mo.1999).  To determine whether the actions of counsel were necessary to protect the

creditor's interest, the court typically looks at: (1) whether, and to what extent, the creditor was

oversecured; (2) whether the debtor provides for payment of the secured claim; and (3) whether

the creditor faced a risk of nonpayment.  *In re Harvey,* 2004 WL 1146628, *3 (W.D. Mo. 2004);

*In re Thomas*, 186 B.R. 470, 478 (Bankr. W.D. Mo.1995).  Secured creditors are not entitled to

be reimbursed for fees incurred in every action taken by their counsel.  *Harvey, 2004 WL at *3;*

*Thomas*, 186 B.R. at 478; *Kroh*, 105 B.R. at 521.

The creditor bears the burden of proof on each of these various elements.  *Harvey, 2004*

*WL at *3; White*, 260 B.R. at 880; *Cushard*, 235 B.R. at 906; *Kroh*, 105 B.R. at 520.  An

applicant must provide supporting documentation that describes the nature of the services in

sufficient detail to permit the court to determine that they are authorized by the agreement,

necessary and reasonable.  *Harvey, 2004 WL at *3; Spidel*, 207 B.R. at 887.  Accordingly,

whenever the "itemization of work performed is not sufficiently specific to identify the services

rendered, the charges for those services will be disallowed.  *Kroh*, 105 B.R. at 522 *quoting  In*

*the Matter of Interstate Stores, Inc*., 437 F. Supp. 14, 16 (S.D.N.Y. 1977).  The court may also

disallow or reduce entries it finds are duplicative or unnecessary.  *Spidel*, 207 B.R. at 887.

Overall, the court has broad discretion in determining the amount of fees to be allowed.  *Thomas*,

186 B.R. at 477; *Kroh*, 105 B.R. at 520.

### ii. Grounds for Objection

In the proof of claim submitted by UNB, it claimed to have incurred attorney's fees in the

amount of $109,797.91.  An additional invoice in the amount of $2,495.25 for fees incurred in

the month of May 2006 was introduced into evidence at trial, raising the total amount of fees

claimed to $112,293.16.  Those fees were incurred by the firms of Thompson & Associates, P.A.

and Baker, Sterchi, Cowden and Rice, L.L.C.  Debtor has objected to the attorney's fees claimed

and presented expert opinion in the form of testimony by Erlene Krigel, a bankruptcy attorney

and Chapter 7 trustee, with regard to various aspects of the work performed by UNB's counsel in

the Chapter 11 proceeding.  Debtor's Exhibit #45 identifies the entries and various categories of

objections asserted by Debtor.  The Court will deal with each of those categories of objection in

turn.

### Fees Related to Best Western Agreement

Debtor objects to all time spent by UNB's counsel in connection with various activities

by Best Western, with whom Debtor had a contractual relationship at the time of the filing of the

case.  Ultimately, the Court approved the termination of that contract and also allowed an

administrative expense claim by Best Western for damages including attorney's fees incurred by

it in the course of the proceeding.  Debtor has identified time entries with a total value of

$2,018.50 describing tasks performed by UNB's counsel relating to Best Western matters.

Debtor claims they should not be allowed for the reason that it was not necessary for UNB's

counsel to incur time on these matters or that the amount of time incurred was unreasonable.

The Court disagrees on both counts.  Operating the hotel with an affiliation with a major

hospitality chain undoubtedly affected the value of the property as well as Debtor's prospects for

reorganization.  Accordingly, those activities had a legitimate relationship to UNB's interest in

its collateral.  The Court does not consider the amount of time spent unreasonable given that it

was just over $2,000.00.  Finally, the Court notes that some of the activities described in the

entries identified by Debtor reflect time expended by UNB's counsel in support of Debtor's

34

positions in litigating against Best Western's attempt to terminate the relationship and assert

administrative expense claims against the estate.  Accordingly, the Court will not disallow any of

the time identified as having been expended in connection with matters relating to Best Western.

### Fees Related to Foreclosure

Debtor also objects to the amount of time spent by UNB's counsel on the foreclosure

proceeding relating to the Hotel Property.  According to Debtor, time entries with a total value of

$8,775.00 as reflected on a portion of its Exhibit #45 related to the foreclosure effort.  Debtor's

expert witness opined that the foreclosure was not particularly complicated and counsel should

have incurred fees in an amount no more than $750.00.  On that basis, Debtor has asked that the

Court disallow the difference.  Once again, after reviewing the time entries, the Court is not in

complete agreement with Debtor with respect to its characterization of them.  Several of the time

entries identified on Debtor's Exhibit #45 in this category include time spent on other matters

and are not wholly attributable to the foreclosure effort.  For example, according to the

descriptions, some of the time was spent on dealing with issues relating to the cell phone tower

which was additional collateral for UNB's claims, issues related to potential buyers of the

property and discussions with holders of junior liens and consideration of the impact on UNB's

options of the existence of those junior claims.  While Debtor appears to believe that the amount

of time spent on the foreclosure sale was excessive, and although it has specifically identified

time entries relating to the foreclosure, Debtor failed either to identify tasks that were allegedly

unnecessary or explain why the amount spent on any one of these items was excessive.  After

reviewing the time entries, the Court does not for the most part find any basis for disallowing

them.  However, the Court has identified several entries relating to foreclosure work, which

35

might be more appropriately relegated to one of  Debtor's other categories of objection and

subject to disallowance or reduction.  For example, a number of the larger time entries include

multiple tasks without time allocations and with descriptions insufficient to permit the Court to

determine why such a large block of time was necessary and whether the resulting fee amount is

reasonable. Several of the time entries consist of multiple telephone calls or conferences with no

description of the subject matter or purpose of the conferences.  These time entries are separately

identified on Appendix A and the fee amounts for the time described in these entries is

discounted by 50%.  *See Woods Auto*, 379 B.R. at 892 (discounting time by 50% for lumping

and inadequate descriptions).

### Fees Related to Assignment of Loan Documents

Debtor also objects to time expended by UNB's counsel in connection with the

acquisition by LNC of the Note and Deed of Trust.  Debtor contends that those activities, while

they may have been protective of the UNB's interest, were unrelated to collection of the amount

due on or enforcement of rights under the Note and are therefore not recoverable under the terms

of the Note and applicable law.  The Court agrees.  These efforts have nothing to do with

enforcing the obligations under the Note and Deed of Trust or collecting the amounts due.

Rather, they relate to UNB's attempt to find someone else to acquire its rights which entity

would then itself be responsible for collecting the amounts due on the Note and enforcing the

Debtor's obligations under the loan documents.  The Court will therefore disallow all attorney's

fees identified as relating to the sale of the Note and Deed of Trust to LNC.  The Court has

reviewed the time entries identified by Debtor as allegedly relating to those activities.  It

disagrees that those entries for time expended on and after May 9 (the date of the foreclosure

36

sale) relate to the assignment.  According to the description, some of that time related to preparation, execution and recording of a substitute trustee's deed and to other matters which have not clearly been identified as relating to the assignment of the note and deed of trust.  The entries subject to disallowance are identified on Appendix B.

### Fees Related to Cell Phone Tower

Debtor has also asked that the Court disallow all time spent by UNB's counsel in review and analysis of matters relating to the cell phone tower attached to the hotel.  Debtor offered testimony with regard to the status of the tower, specifically whether it was attached to the real estate in such a way as to become a fixture.  Ultimately, the Court believes that testimony is not relevant as the claimant introduced testimony demonstrating that it had a separate assignment of a lease on the cell phone tower and of the resulting revenues.  Accordingly, UNB had a legitimate interest in the fate of the lease on the cell phone tower and the disposition of the rental proceeds resulting from that contract.  The Court has examined each of those time entries and does not find the time to be unreasonable, particularly, because in the aggregate, it is just barely in excess of $2,000.00.  Accordingly, the Court will allow all the identified entries relating to the cell phone tower and related contracts and agreements and overrules the Debtor's objection to the fees to that extent.

### Fees Related to Proofs of Claims

Debtor also objects to time it identifies as having been spent preparing a proof of claim in the case.  Debtor's expert identified time entries with a total value of $1,959.00 as allegedly relating to the preparation and filing by the bank of its proof of claim.  Debtor asserts that should be reduced to the sum of $500.00, as being the reasonable amount allowable for such an activity.

37

Once again, the Court has examined the identified entries and finds that Debtor's

characterization of them is inaccurate.  In many instances, the time spent relates to responding to

an objection filed by Debtor to a proof of claim.  Time was also expended in preparation of

numerous amendments to the original proof of claim.  Accordingly, Debtor's assertion that all of

the identified time entries were spent on preparation and filing of a simple proof of claim is

inaccurate.  After having examined the entries, the Court does not find the tasks conducted to

have been unnecessary or the amount of time spent unreasonable and, therefore, will allow each

of the identified entries in full and overrules Debtor's objection to this extent.

### Duplicative Entries

Debtor also objects to numerous time entries which it claims are duplicative claiming

they reflect conferences between counsel and thus situations in which more than one lawyer was

involved.  The Court has reviewed each of the time entries identified and with two exceptions

which will be identified, disagrees with Debtor's characterization.  In one instance, Debtor is

correct that the time entry has been duplicated, that is the same time entry is actually recorded in

two different places on the statement and has been billed twice.  In another instance, the

descriptions reveal that both counsel were working on the same matter on the same day (an

outline of issues for the § 341 meeting) without any explanation of the need for such apparently

duplicative effort.  The amount of time identified by Debtor, however, is the entire time entry for

one counsel, although that  entry also includes additional tasks.  The Court has imputed an

amount for the task in question and disallows that amount only.  The chart attached as

Appendix C, identifies those entries subject to disallowance or adjustment.  In each other

instance, the Court believes that Debtor has failed to substantiate its claim that the time entries

38

involved are truly duplicative.  With the exceptions noted, none of them involves a situation in which time is billed twice or where the same timekeepers were working on the same matter during the same period of time without explanation.  Almost without exception, the entries identified involve short conferences between a junior and senior lawyer.  In some instances, the entries are not duplicative in that the billing statement reflects that no time was charged for one of the involved timekeepers.  In other instances, the conferences appear to have been relatively short in duration (in most instances, no more than 2/10 or 3/10 of one hour) in which it appeared that lawyers working on the case were simply communicating with one another to exchange information or to obtain or offer strategic guidance.  Such communication and advice is necessary among counsel working on different aspects of the same case and appears in each instance to have been minimal.  The Court is not convinced after reviewing the entries that these conferences were unnecessary or the amounts billed were unreasonable.  The Court will disallow the two entries identified on Appendix C (or portions thereof).  The other identified entries will be allowed and the Debtor's objection is therefore overruled to that extent.

### Fees on Clerical Matters

Debtor also contends that certain entries on the billing statements submitted by UNB reflect work which was purely secretarial or clerical, is part of the firm's overhead, and, therefore, should not be billed at an hourly rate.  Once again, the Court has reviewed each of the identified entries.  After conducting that review, the Court has identified approximately a half dozen entries which it believes involve routine file maintenance or administrative tasks, such as electronic filing of pleadings which should be disallowed.  Those entries are identified on Appendix D.  The Court disagrees with Debtor's characterization of the remaining entries.  In

some instances, the time entries reveal that the services performed were not clerical at all.  In many other instances, the descriptions of the time expended specifically state that they involve analysis of the records or file material involved.  Some of them specifically identify and include tasks other than the ones which Debtor apparently thinks are clerical or administrative in nature. Accordingly, with the exception of the entries identified on Appendix D, the Court will allow the time entries identified on this portion of Debtor's Exhibit #45 and overrules Debtor's objection to that extent.

## Fees on Title Report Review

Debtor also objects to time spent by UNB's counsel reviewing one or more title reports. The total time expended as identified by Debtor is eight hours with a value of $1,520.00. Debtor's expert would allow $600.00 for this purpose.  Debtor does not contend that it was unnecessary to review the title reports, but apparently believes that the amount spent was not reasonable.  Only four time entries are involved.  The Court has reviewed each of them and once again disagrees with Debtor's characterization of the entries.  In each instance, the identified time entry includes numerous tasks other than mere review of the title report.  Accordingly, it is apparent that the value of the time spent on reviewing title reports is not the entire $1,520.00 identified by Debtor.  For this reason, the Court will allow the entries and overrules the Debtor's objection to this extent.

## Insufficient Descriptions

Debtor also objects to numerous entries from the time records submitted by UNB's counsel on the grounds that the descriptions of the time expended are insufficient to permit meaningful review.  After having reviewed the identified entries, the Court agrees in substantial

40

part.  Almost all the time entries by Mr. Thompson and many of the entries by Mr. Babcock

reflect conferences with or among certain individuals with absolutely no indication of the

matters discussed or the purpose of the conference or correspondence with certain individuals

with no indication of the nature, purpose or content of the correspondence.  Accordingly, it is

impossible for the Court to determine to what issues or matters these conferences and

correspondence related, whether they were necessary and whether the time expended was

reasonable.  Rather than disallow the entries in their entirety, the Court will discount the

aggregate time identified in these entries by 50%.  *See Woods Auto*, 379 B.R. at 892.  In certain

instances, the identified time entries included matters other than the conferences and

correspondence and that from the context, the Court can ascertain the nature and purpose of the

conference or correspondence and has determined not to discount the entries.  All of the other

entries identified on this portion of Debtor's Exhibit #45 and listed on Appendix E are

discounted for the reasons indicated.

### Fees Related to Fee Applications

Debtor also objects to time spent by UNB's counsel which it characterizes as having

involved objections or challenges to attorney's fees sought by Debtor's counsel.  Debtor claims

that attorney's fees of $6,902.00 were expended in such efforts, that such time was excessive and

should be allowed only in the amount of $1,500.00.  Accordingly, Debtor's objection is not that

it was unreasonable for UNB to be concerned about the fees incurred, which in some instances

would be paid from its cash collateral, but the total time spent on these matters was

unreasonable.  After reviewing each of the identified time entries, the Court once again believes

that Debtor has inaccurately characterized many of them.  Some of them, such as the first two

41

entries listed on this portion of Debtor's Exhibit 45 include time spent on other matters.

Therefore, it is not the case that the entirety of those entries related to Krigel & Krigel fee

matters.  Similarly, the June 1, 2005, entry of Mr. Babcock does not relate to fees of Krigel &

Krigel at all.  Some of the entries describe time expended by UNB's counsel in responding to

Debtor's motion for reconsideration of this Court's order regarding the basis on which its

counsel would be compensated on one of the litigation matters on which it was engaged.  Since

this Court agreed with the UNB's objection and denied that motion for reconsideration, it does

not consider the time expended by UNB's counsel on that matter to be unnecessary, nor does it

believe after reviewing the entries that the amount of time expended was unreasonable.  Some of

the entries include time for simple pleading review of applications or fee notices sent by

Debtor's counsel which does not appear to have been extensive.  In addition, the fee matters

dealt with by these numerous entries include not merely the application by Debtor's counsel for

compensation in connection with representing the Debtor in the case in chief, but also in

connection with the Holiday Inn and Hanover litigation matters including a proposed surcharge

to the collateral for fees incurred by Debtor's counsel in connection with one of those matters.

Accordingly, the Debtor's characterization that all this time was spent on reviewing or

challenging applications for fees for its counsel in connection with their representation of the

Debtor in the Chapter 11 proceeding is inaccurate.  Given the number and nature of the matters

involved and the activities described, the Court does not believe that the tasks were unnecessary

or the time unreasonable.  The entries will therefore be allowed in full and the Debtor's objection

overruled to that extent.

**Travel Time/Miscellaneous**

The final category of objection by the Debtor to the fee statements attached to UNB's proof of claim is apparently comprised of entries which Debtor believes are either excessive or include travel time which should be discounted.  Four of the entries do include time for travel, which this Court has previously held should be compensated at half of the timekeeper's customary hourly rate unless work was actually performed en route.  *Woods Auto*, 379 B.R. at 893; *In re Vantage Inv., Inc.*, 328 B.R. 137, 145 (Bankr. W.D. Mo. 2005); *see also Bachman v. Laughlin (In re McKeeman)*, 236 B.R. 667, 672 (8th Cir. 1999) (unreasonably charged hourly rate for travel time).  Since no attempt has been made by the claimant to demonstrate that work was performed en route, the Court will discount the hourly rate on the imputed travel time for entries as reflected on Appendix F.  Also on that appendix, the Court has identified several entries on this portion of Exhibit #45 involving substantial blocks of time on multiple matters, without time allocations or sufficient descriptions to permit this Court to determine whether the tasks were necessary or the amount of time spent reasonable.  Accordingly, as to those entries, the Court will discount the time value by 50%.  *See Woods Auto*, 379 B.R. at 892.

## Post-Foreclosure Time

In addition to the time reflected on the fee statements submitted by UNB's counsel attached to the proof of claim, WWW also seeks recovery for fees and expenses incurred subsequent to the filing of the proof of claim for matters relating to the litigation of this objection.  In support of that request, claimant has submitted fee statements from two firms involved in the claim objection proceedings.  These include fee statements from the firm of Grimes & Rebein, L.C., from the period beginning November 1, 2006, through February 28, 2007, including fees and expenses in the total amount of $4,790.00.  Debtor has identified only

43

one allegedly objectionable entry from these statements, an entry on January 26, 2007, for 9/10

of one hour for a telephone conference with Scott Carter regarding an amendment to the proof of

claim. The Court finds nothing particularly offensive about this entry and overrules the Debtor's

objection to this amount being recovered by claimant.

In addition, statements from the firm of Hazelton & Laner LLP, for the time period

beginning on October 27, 2006, and extending through the end of the month of January 2007 in

the total amount of $16,321.27 were submitted. The fees and expenses are reflected on three

statements, the first of which is dated October 31, 2006. It reflects 20 hours of legal work at the

rate of $160 an hour for a total fee amount of $3,200.00. Ms. Hazelton conceded that much of

the work related to obtaining a liquor license for operation of the hotel and is unrelated to the

objections to the proof of claim or other efforts to collect the amount owed by the Debtor on the

promissory note. Ms. Hazelton contends that five hours of this time related to these proceedings

and a handwritten notation to that effect is included on the fee statement introduced into

evidence. Neither that handwritten notation nor the original time entry includes any detailed

description of the tasks performed, the date on which they were performed, by whom performed,

or the time spent on those individual tasks. As a description of services rendered, it falls far

below the minimum standards this Court expects for fee statements submitted by counsel who

expect to receive compensation from the estate or as part of a secured claim under § 506(b) of

the Bankruptcy Code. *See Woods Auto*, 379 B.R. at 893. Accordingly, no compensation will be

allowed with respect to services described on this invoice. Ms. Hazelton conceded in her

testimony that all of the expenses shown on the statement in the amount of $398.89 are related to

the acquisition of the liquor license and, therefore, not part of the proof of claim in this case.

44

The next statement is dated November 30, 2006, and reflects time expended in the total amount of 15.6 hours with a value of $2,475.00. As to the time, Ms. Hazelton testified that only approximately one hour of the time was spent on liquor licensing issues and the rest is attributable to this case. Once again, however, there is one block entry with an overall ascription of an amount of time with no detail. This time entry is obviously not based on contemporaneous time entries and there is no detailed information of the kind this Court expects as discussed above. Therefore, for the same reasons, no time will be allowed with respect to this fee statement. With regard to the expenses, Ms. Hazelton testified that all of the expenses listed on this fee statement are attributable to the liquor licensing matter and should not be part of the allowed claim in the case.

Finally, a fee statement dated January 31, 2007, for time and expenses incurred in the months of December 2006, and January 2007 reflects total time of 41.8 hours with a value of $6,555.00, all of which according to Ms. Hazelton's testimony is attributable to this matter. Once again, it is all lumped into one entry dated January 5 purporting to accumulate 40 hours of time spent in two different months on the matter. For the reasons described above, all this time will be disallowed. With respect to the expenses, Ms. Hazelton testified that the only expenses listed which relate to this proceeding are the costs of an airline ticket for a Debtor representative to appear for a deposition in Kansas City in the amount of $952.20, court reporter fees in the amount of $1,500.00 for that deposition, photocopy costs of $458.00 relating to document production and a delivery charge of $17.60 relating to appraisals conducted for the claimant. This Court will therefore allow costs in the amount of $2,927.80 and disallow all other fees and costs itemized on the January 31, 2007, fee statement.

45

In summary, the Court has identified time entries of the total value of $13,851.50 from these various categories on Debtor's Exhibit #45 related to time expended prior to the litigation on the proof of claim which it has determined to disallow.  The net fee allowance for that time would thus be $98,441.66.  In addition, the Court has determined to allow attorney's fees and expenses incurred by the firm of Grimes & Rebein in the total amount of $4,790.00 and expenses incurred by Hazelton & Laner in the amount of $2,927.80 for an additional allowance of $7,717.80, making the total amount of attorney's fees and expenses allowed on the proof of claim $106,159.46.

### c. Interest

### i. Pre-Foreclosure Interest

In Amended Claim No. 44, WWW asserts a claim for unpaid interest in the amount of $219,816.41.  Debtor argues that if the pre-foreclosure interest is to be allowed, it should be allowed in the amount of $214,279.91.  Interest on the claim subsequent to the filing of the petition is recoverable in this instance for the same reason that the Court has chosen to allow post-petition attorney's fees – the estate is solvent.  Courts allow such interest in order to prevent the debtor from receiving a windfall at the expense of creditors.  *In re Carter*, 220 B.R. 411 (Bankr. D.N.M.1998); *In re Gaines*, 178 B.R. 101, 103 (Bankr. W.D. Va1995); *In re San Joaquin Estates, Inc.*, 64 B.R. 534 (9th Cir. B.A.P.1986).  The allowance of post-petition interest is discretionary with the court and depends on the equities of the case.  *Carter*, 220 B.R. at 414; *Gaines*, 170 B.R. at 103; *San Joaquin Estates*, 64 B.R. at 536.  As with other components of the claim, as noted above, the claim for interest is prima facie valid in the amount claimed, making it

46

incumbent upon the Debtor to demonstrate a legal reason why the interest is not recoverable or a factual reason why the amount of interest claimed is inaccurate.

Debtor cites its Exhibit #46, showing a figure for interest accrued on the loan as of May 1, 2006 in the amount of $214,279.91.  Debtor fails to demonstrate how that amount correlates with the accrued and unpaid interest from the date the Debtor last made a payment on the loan prior to the filing of the Chapter 11 case through the date of foreclosure.  Debtor also cites a figure on page 3 of WWW's Exhibit F purporting to show interest in the amount of $214,279.91.  Try as it might, the Court cannot find that figure on Exhibit F.  Moreover, an unexplained raw number on Exhibit F fails to demonstrate that WWW's calculation of accrued and unpaid interest through the date of foreclosure is inaccurate.  Because the Debtor has failed to satisfy its burden of demonstrating that there is either a legal or a factual reason why the amount of interest claimed in Amended Claim No. 44 should not be awarded, this portion of Debtor's objection is overruled and the amount allowed will include pre-foreclosure interest of $219,816.41.

### ii. Post-Foreclosure Interest

Similarly, Debtor disputes the post-petition foreclosure interest claimed of $14,622.71. However, Debtor offers no legal or factual basis for a dispute, suggesting merely that no calculation of the post-foreclosure interest was placed in evidence.  As noted above, because the properly filed proof of claim is prima facie valid, Debtor may not successfully object to this component of the claim by merely contending that WWW has failed to substantiate the itemized amount of interest sought.

47

Debtor apparently disputes the calculation arguing that the 10% figure used is excessive

and that interest should be calculated at the Missouri statutory judgment rate of 9%. There has,

however, been no judgment on the claim and the state statutory judgment rate would be

applicable only if the contract did not specify a rate of interest. *Carter*, 220 B.R. at 415 *citing In*

*re Schoeneberg*, 156 B.R. 963, 972 (Bankr. W.D. Tex.1993). Because Debtor offered no legal or

factual basis for denying the amount of post-foreclosure interest as claimed, its objection to this

component of Amended Claim No. 44 is overruled, and the Court will allow post-foreclosure

interest in the amount of $14,622.71.

### C. Debtor's Claims for Affirmative Relief

### 1. Standing

Citing *Harstad v. First Am. Bank*, 39 F.3d 898 (8th Cir.1994), WWW and LNC assert that

Debtor lacks standing to assert the affirmative claims for relief contained in the Adversary for

the reason that Debtor did not retain such rights in the plan of reorganization or describe the

potential claims in the disclosure statement. The *Harstad* case involved a claim for avoidance of

an allegedly preferential transfer pursuant to 11 U.S.C. § 547. That transfer had obviously

occurred prior to the filing of the petition and the existence of the claim was known to or could

have been determined by the debtor before the preparation of the plan and disclosure statement.

Part of the rationale for the holding in *Harstad* is that creditors are entitled to know before

balloting if Chapter 11 debtors intend to pursue such claims against them subsequent to

confirmation of the plan. *Harstad*, 39 F.3d at 903. This case is clearly distinguishable and does

not involve the same considerations. The point may be moot for the reason that the Court has

denied each of Debtor's requests for affirmative relief and the *Harstad* rationale clearly does not

48

apply to a mere objection to the allowance of a creditor's claim.  However, *Harstad* is clearly

distinguishable as in this case, Debtor's affirmative claims for relief stem from events which

occurred subsequent to the confirmation of the plan of reorganization.  They were therefore not

known by and could not have been anticipated by Debtor at the time the disclosure statement and

plan of reorganization were prepared.  Similarly, they had no role in determining whether the

Defendants' predecessors would have cast a vote in favor of or against Debtor's plan of

reorganization.  For these reasons, the Court rejects the argument that Debtor lacks standing to

assert the claims asserted in the Adversry based on *Harstad*.

## 2. Specific Claims for Relief

Approximately a year after the foreclosure sale, after the parties expended an exorbitant

amount of time and energy litigating a multitude of issues related to the Hotel Property

deficiency claim, Debtor's counsel apparently had an epiphany regarding whether the Personal

Property was properly foreclosed and filed a complaint initiating the Adversary.  In the

complaint, Debtor asserts that WWW should not receive a deficiency for a myriad of reasons

including non-compliance with the UCC.  Debtor also asserts claims for affirmative relief for

conversion, breach of contract, failure to account for the Personal Property and that WWW's or

LNC's lien in the Personal Property is void or voidable.  Although the outcome of some of the

claims asserted in the Adversary is determined by the Court's disposition of issues raised in the

Objection, the Court will nonetheless discuss each one of the affirmative claims for relief below.

## a. Conversion

The Court's finding that the Personal Property was legally foreclosed with the Hotel

Property, such that WWW's possession, use, and assumption of ownership since the foreclosure

sale was not wrongful, effectively moots Debtor's conversion claim.  However, even if the Court

had decided differently on this issue, the facts in this case do not support a claim for conversion.

"Conversion is the unauthorized assumption of the right of ownership over the personal property

of another to the exclusion of the owner's rights." *Stulz v. Citizen's Bank and Trust Co.*, 160

S.W.3d 423, 427 (Mo.App.W.D.2005).  If the owner consents, there is no unauthorized taking.

*Maples v. United Sav. and Loan Assoc.*, 686 S.W.2d 525, 527 (Mo. App.1985).  That consent

can either be express or implied.  *Id. citing Graves v. Stewart*, 642 S.W.2d 649, 650-651 (Mo.

banc 1982).  "Implied" means necessary deduction from the circumstances, general language or

conduct of the parties. *Id. citing Farm Bureau Mut. Ins. Co. of Mo. v. Dryden*, 492 S.W.2d 392,

394 (Mo.App.1973).  "Implied consent" is that manifested by signs, actions or facts, or by

inaction or silence which creates an inference that consent has been given. *Id. citing State v.

Stanfield*, 1 S.W.2d 834, 836 (Mo.1927).

     Had the Court determined that the Personal Property was not foreclosed pursuant to

§ 400.9-604(a)(2), and that WWW's possessory interest in the Personal Property required an

analysis, it still would have found that Debtor impliedly consented to WWW's use, possession

and ownership of the Personal Property.  The Court finds WWW's reliance on *Maples v. United

Sav. and Loan Assoc*, *supra*, persuasive.  In *Maples*, the mortgagor's home was foreclosed on in

March.  Discussions were had regarding removal of the personal property at the foreclosure.

The mortgagors retained keys to the property to remove the property, but did nothing.  The

mortgagors received a letter in May, which stated their property would be removed from the

foreclosed property in ten days.  They then removed some, but not all, of their property.  In late

June, the mortgagee had the rest of the property removed. *Maples*, 686 S.W.2d at 526**.**

50

Mortgagors brought an action for conversion.  The Court found that the mortgagors impliedly

consented to the mortgagee's removal of the personal property, therefore, no cause of action for

conversion existed.

In this case, Debtor marketed the Hotel Property as an operating business, which almost

certainly means it includes things like beds, furniture, furnaces and the like.  The Hotel Property

was sold as a going concern and the evidence is that the business never had to close its doors,

which again strongly indicates that the parties intended the Personal Property to be sold as part

of the sale.  On more than one occasion, a representative of Debtor actually stayed on the hotel

premises after the foreclosure sale, and used some of the property that it now alleges is being

wrongfully used and possessed by WWW.  The Court would be hard pressed to find a stronger

case for implied consent for the use and possession of personal property.

Debtor's attempt to distinguish *Maples* is unpersuasive.  This case does not involve a

written notice to remove the personal property with a deadline for response.  In all other respects,

it is consistent with the principles of implied consent set forth in the Missouri cases.  Given the

lapse of time, Debtor's clear knowledge of WWW's use and disposition of the property and its

failure to object, the Court is warranted in concluding that Debtor gave its implied consent to

WWW's exercise of control over the Personal Property.

### b. Breach of Contract

In Count II of the Adversary, Debtor asserts a claim against WWW and LNC for breach

of contract.  The claim is predicated upon obligations allegedly imposed upon the lender in the

security agreement originally executed between Debtor and UNB.  First, Debtor contends that

that document provides for notice and a commercially reasonable sale of the Personal Property

subject to the security agreement in the event of default.  Debtor argues that lender, LNC as

asignee, has breached the provisions of the security agreement by failing to give notice of default

and by failing to provide a notice of sale describing the Personal Property.  Neither in the

Adversary nor in its post-trial submissions does Debtor cite any particular provision of the

security agreement as establishing these obligations.  The applicable paragraph of the security

agreement (Debtor's Exhibit #54) is paragraph 20 describing the rights of the lender in the event

of default.  The prelude to the enumeration of the lender's rights on default specifically provides

that the remedies may be exercised "without notice or demand (except as required by law)."

Accordingly, the agreement does not impose a requirement that advance notice of default be

given unless required by some other provision of law.  The agreement provides that unless the

collateral is perishable, the lender must provide reasonable notification of the time and place of

any sale or intended disposition "as required under the Uniform Commercial Code."  Therefore,

the requirement relating to notice of sale is specifically conformed to whatever obligation is

imposed by the UCC.  The provision also authorizes the lender to "comply with any applicable

law" in the disposition of the collateral.  Accordingly, Debtor's breach of contract claim is

essentially indistinguishable from the claim contained in Count  IV of the Adversary (which the

Court discusses below) for breach of provisions of the UCC.  If the only obligation imposed

upon LNC with regard to notice of default or notice of sale are the obligations imposed by Part 6

of Article 9 of the UCC, Debtor has failed to demonstrate a breach of the agreement.  As this

Court has concluded above, the documentation entitled LNC to take advantage of the provision

of the UCC which authorize it to conduct a mixed sale of the real and personal property, such a

sale would not be governed by the provisions of Part 6 of Article 9.

Debtor also argues that the security agreement imposes a requirement for the application of the proceeds from the sale of the Personal Property and alleges that this has not been done. Once again, Debtor's claim is not supported by the language of the security agreement or by the facts.  The only provision in the security agreement relating to application of proceeds is paragraph 21 which provides that payment received may be applied by the lender in whatever manner it chooses.  The only application that would be required would be a reduction in the amount of the claim by the proceeds received from the mixed sale of the Hotel and Personal Property.  That application was essentially made when WWW filed Amended Claim No. 44.  In addition, this Court, in the context of the Debtor's objections, has determined the appropriate amount of the claim after application of those proceeds.

Debtor also argues that LNC retained possession of the Personal Property in violation of the terms of the agreement and Article 9.  This claim is predicated upon the assumption that LNC failed to conduct an appropriate foreclosure sale of the Personal Property.  This claim must be denied as the Court has already held that a sale of the Personal Property was in fact conducted, that it was a mixed sale in conjunction with the sale of the Hotel Property, which the documentation and the UCC authorized LNC to do, and that the sale was conducted in conformity with the applicable Missouri real estate foreclosure laws.  LNC clearly had a right to take possession of the Personal Property to conduct a disposition based on Debtor's failure to close the sale of the Hotel Property as specified in Debtor's second amended confirmed plan and the Court's order authorizing the foreclosure sale.  Since the Court has held that sale was not in violation of any applicable legal principles, the purchaser of the Hotel and Personal Property at

the foreclosure sale is the owner of all the property with the right to use and possess it.  There

has, therefore, been no violation of the agreement or the UCC.

Debtor also notes that the UCC financing statement filed by the lender prior to the filing

of the Chapter 11 petition expired during the course of the case and was not renewed.  An

identical claim is made in Count V of the adversary complaint as discussed in greater detail

below.  In summary, lapse of perfection caused by the expiration of the financing statement is

irrelevant because the sale was held before the lapse and because the lien would remain effective

against the Debtor notwithstanding the expiration of the financing statement.

Debtor also contends that the agreement obligated the lender to provide an accounting of

the proceeds of any sale of the Personal Property and that  has not been done.  This claim

essentially duplicates the Debtor's complaint above that the lender failed to account for and

apply proceeds from disposition of the Personal Property and also duplicates its separate claim

for an accounting contained in Count IV of the Adversary which will be discussed below.

### c. Accounting

In Count III of the Adversary, Debtor asserts a claim against  WWW and LNC for an

accounting.  Debtor argues that the lender under the security agreement had a fiduciary

obligation to maintain appropriate records of payments and to provide an accounting of amounts

received on disposition of the collateral.  Debtor also maintains that the lender had an obligation

under the agreement and the UCC to account for amounts received and for the disposition of the

personal property collateral.

To establish a right to an equitable accounting, a plaintiff must demonstrate: (1) a need

for discovery; (2) that the nature of the accounts is complicated; (3) the existence of a fiduciary

54

duty between the parties; and (4) the lack of any adequate remedy at law.  *Cook v. Martin*, 71

S.W.3d 677 (Mo. App.W.D.2002).  To the extent this claim is based upon an alleged fiduciary

duty existing between the lender and  Debtor, it must be rejected.  The courts have consistently

held that no fiduciary relationship arises between a creditor and a debtor merely by reason of that

relationship.  *Yoest v. Farm Credit Bank of St. Louis*, 832 S.W.2d 325, 328 (Mo.App.W.D.1992).

 Absent unusual circumstances, the debtor-creditor relationship is simply not a fiduciary one.

        To the extent Debtor's claim for an accounting is based upon the language of the

agreement or the UCC, it fails for the same reasons that its breach of contract claim fails.  Debtor

cites no provision in the agreement which obligates the lender to provide such an accounting.  To

the extent it arises under some provision of Part 6 of Article 9, it is rendered inapplicable by the

LNC's use of its rights to conduct a mixed sale in accordance with applicable real estate

foreclosure laws.  Moreover, as noted above, to the extent that some accounting might be

required, it has essentially been provided by the act of applying the credit bid made at the sale, to

the amount of the claim as of that time, as indicated in Amended Claim No. 44.  Once again, to

the extent that an accounting is required, Debtor is obtaining precisely that as a result of these

extensive proceedings on the Objection and the Court's determination of the appropriate amount

of the claim after application of the sale proceeds.  As to the Personal Property, since the Court

has held that it was legally and properly sold, no particular accounting is necessary as Debtor no

longer has any rights to it.  As noted, the proceeds from the sale of the Hotel and Personal

Property have already been accounted for by application of the same to the outstanding balance

due pursuant to Amended Claim No. 44.

### d. Breach of Article 9

Debtor also argues that it is entitled to relief as a result of LNC's failure to abide by certain obligations imposed by Part 6 of Article 9 of the UCC, including LNC's alleged failure to give notice, to conduct a commercially reasonable foreclosure sale and to account for and appropriately apply the proceeds of the disposition of the collateral.  Debtor argues that by reason of these breaches, LNC is not entitled to a deficiency, and to the extent the value of the Personal Property sold exceeds the amount due on the claim after application of the Hotel Property proceeds, it should receive a surplus.

Each one of these claims is predicated upon the assumption that one or more provisions of Part 6 of Article 9 of the UCC was applicable to LNC's sale of the Personal Property and that LNC failed to comply with those provisions.  As the Court has held, because the provisions of Part 6 of Article 9 were inapplicable to the sale conducted, they cannot form the basis of a claim for affirmative relief.  The Deed of Trust, in addition to granting the lender an interest in the Hotel Property, also acted as a security agreement granting LNC a security interest in the Personal Property, which authorized LNC to conduct a mixed sale of the Hotel and Personal Property.  Because the Court found that LNC took advantage of that provision, the detailed provisions of Part 6 are inapplicable to the sale and thus cannot form a ground for claims for relief even if the lender failed to comply with their provisions.

### e. Lien Avoidance

In Count V of the Adversary, Debtor asserts a claim to avoid the lender's lien in the Personal Property.  Debtor alleges that the financing statement taken to perfect the lender's interest in the Personal Property lapsed during the course of the case and was not renewed.

56

Debtor alleges that as a result, the lender's interest in the Personal Property "is and remains unsecured" and asks for a determination that it has no continuing rights in the Personal Property.

Debtor apparently asserts this claim in the alternative, to apply to the scenario which would occur if this Court were to have held that the lender had not sold the Personal Property on May 9, 2006.  In order to prevent the lender from taking the position that it then simply had to conduct a commercially reasonable sale of the Personal Property, Debtor seeks a determination that it no longer has an enforceable claim to the collateral.  Since this Court has held that the Personal Property was sold at the foreclosure sale, in compliance with applicable law, the claim asserted in Count V is essentially moot.  Since the property was sold before the financing statement expired, its subsequent lapse is irrelevant.  Even so, a lapse in the effectiveness of the financing statement would not affect the validity of the security interest as between Debtor and the claimant.  *In re Thompson*, 315 B.R. 94, 105 (Bankr. W.D. Mo.2004).

Debtor may be arguing that, although the interest may remain enforceable against Debtor, it is no longer effective against third parties, as it may be avoided under 11 U.S.C. § 544.  Such a claim would fail because the relative rights of secured and unsecured creditors with respect to avoidance under this section are frozen as of the time of the filing of the petition.  *Toranto v. Dzikowski*, 380 B.R. 96 (Bankr.S.D. Fla.2007).  Therefore, the subsequent lapse of the perfection of the security interest does not render the lien avoidable if it was not avoidable at the time of the filing.

### III. Summary and Conclusion

For all of the reasons stated above, Debtor's Objection to Amended Claim No. 44 is sustained in part and overruled in part.  The Court partially overrules the Objection and will

allow WWW a deficiency claim against Debtor's estate in the total amount of $126,765.01.  The

deficiency claim consists of the sum of following: principal of $1,763,063.45,  pre-foreclosure

attorney's fees of $98,441.66, late fees of $21,278.18, pre-foreclosure interest of $219,816.41,

and costs, including an appraisal, title report and publication, of $1,825.00; less the foreclosure

bid of $2,000,000; plus post-foreclosure attorney's fees of $7,717.80, and post-foreclosure

interest of $14,622.71.  The remainder of Debtor's Objection, specifically Debtor's objection to

WWW's request to include costs for real estate taxes and repairs, is sustained.

The Court denies Counts I, II, III, IV and V of the Adversary.  Judgment is entered in

favor of WWW and LNC on all Counts and the Adversary is hereby dismissed.   A separate

order will be entered as required by Rule 9021.

ENTERED this 14th day of March 2008.


                                        /s/ Dennis  R. Dow
                                        HONORABLE DENNIS R. DOW
                                        UNITED STATES BANKRUPTCY JUDGE


cc:
Robert D. Gaines
Stephanie Hazelton
Cynthia Grimes

**APPENDIX A**

| Date | Timekeeper | Time Entry | Amount Disallowed |
|------|-----------|-----------|-------------------|
| 3/28/06 | CSC | 2.0 | $190.00 |
| 3/29/06 | CSC | .9 | $85.50 |
| 4/18/06 | CSC | 2.5 | $237.50 |
| 4/20/06 | CSC | 2.3 | $218.50 |
| 4/21/06 | RAB | 1.3 | $130.00 |
| 4/26/06 | CSC | 2.0 | $190.00 |
|  |  | **Total Disallowed:** | $1,051.50 |

**APPENDIX B**

| Date | Timekeeper | Time Entry | Amount Disallowed |
|------|-----------|-----------|-------------------|
| 4/27/06 | CSC | 1.0 | $190.00 |
| 4/28/06 | CSC | 1.4 | $266.00 |
| 4/30/06 | CSC | .9 | $171.00 |
| 5/1/06 | RAB | 3.5 | $700.00 |
| 5/1/06 | CSC | 2.9 | $551.00 |
| 5/2/06 | RAB | 2.8 | $560.00 |
| 5/2/06 | CSC | 2.5 | $475.00 |
| 5/3/06 | RAB | 1.4 | $280.00 |
| 5/3/06 | CSC | 3.1 | $589.00 |
| 5/4/06 | RAB | .5 | $100.00 |
| 5/4/06 | CSC | 3.3 | $627.00 |
| 5/5/06 | RAB | 1.1 | $220.00 |
| 5/5/06 | CSC | 4.6 | $874.00 |
| 5/8/06 | RAB | .2 | $40.00 |
| 5/8/06 | CSC | 1.0 | $190.00 |
| 5/9/06 | RAB | .7 | $140.00 |
| 5/9/06 | CSC | .8 | $152.00 |
| | | **Total Disallowed:** | $6,125.00 |

**APPENDIX C**

| Date | Timekeeper | Time Entry | Amount Disallowed |
|------|-----------|------------|-------------------|
| 11/29/04 | TNT | .5 | $75.00 |
| 7/7/05 | CSC | 1.0 | $190.00 |
| | | **Total Disallowed:** | $265.00 |

**APPENDIX D**

| Date | Timekeeper | Time Entry | Amount Disallowed |
|---|---|---|---|
| 6/1/05 | LAO | .2 | $16.00 |
| 9/13/05 | GXG | 1.0 | $80.00 |
| 2/20/06 | GXG | .5 | $40.00 |
| 2/28/06 | GXG | .3 | $12.00 |
| 3/23/06 | GXG | 1.2 | $48.00 |
| 4/17/06 | GXG | .3 | $12.00 |
| | | **Total Disallowed:** | $208.00 |

**APPENDIX E**

| Date | Timekeeper | Time Entry | Amount Disallowed |
|---|---|---|---|
| 11/1/04 | TNT | 3.0 | $225.00 |
| 11/2/04 | TNT | .8 | $60.00 |
| 11/9/04 | TNT | .2 | $15.00 |
| 11/15/04 | TNT | .6 | $45.00 |
| 11/16/04 | TNT | 2.8 | $210.00 |
| 11/17/04 | TNT | .3 | $22.50 |
| 11/18/04 | TNT | 2.0 | $150.00 |
| 11/19/04 | TNT | .7 | $52.50 |
| 11/30/04 | TNT | .3 | $22.50 |
| 12/1/04 | TNT | .2 | $15.00 |
| 12/10/04 | TNT | .4 | $30.00 |
| 2/16/05 | RAB | .5 | $50.00 |
| 2/17/05 | RAB | .2 | $20.00 |
| 2/21/05 | RAB | 1.3 | $130.00 |
| 2/23/05 | RAB | .2 | $20.00 |
| 3/2/05 | RAB | .2 | $20.00 |
| 3/7/05 | RAB | .5 | $50.00 |
| 3/10/05 | RAB | 1.5 | $150.00 |
| 3/18/05 | RAB | .3 | $30.00 |
| 3/23/05 | RAB | .2 | $20.00 |
| 3/25/05 | RAB | .6 | $60.00 |
| 3/29/05 | RAB | 2.2 | $220.00 |
| 4/1/05 | RAB | .6 | $60.00 |
| 4/4/05 | RAB | .9 | $90.00 |
| 4/5/05 | RAB | .3 | $30.00 |

| Date | Timekeeper | Time Entry | Amount Disallowed |
|------|-----------|-----------|-------------------|
| 4/8/05 | RAB | .2 | $20.00 |
| 4/11/05 | RAB | .9 | $90.00 |
| 4/12/05 | RAB | 1.6 | $160.00 |
| 4/22/05 | RAB | 2.2 | $220.00 |
| 4/29/05 | RAB | .7 | $70.00 |
| 5/8/05 | RAB | .5 | $50.00 |
| 5/9/05 | RAB | .5 | $50.00 |
| 5/9/05 | RAB | .4 | $40.00 |
| 5/12/05 | RAB | .5 | $50.00 |
| 5/25/05 | RAB | .2 | $20.00 |
| 5/26/05 | RAB | 1.4 | $140.00 |
| 5/31/05 | RAB | 1.3 | $130.00 |
| 6/9/05 | RAB | .1 | $10.00 |
| 6/17/05 | CSC | .4 | $38.00 |
| 6/20/05 | RAB | .2 | $20.00 |
| 6/22/05 | RAB | .5 | $50.00 |
| 6/29/05 | RAB | .2 | $20.00 |
| 7/8/05 | RAB | .8 | $80.00 |
| 7/14/05 | RAB | .5 | $50.00 |
| 7/25/05 | RAB | .6 | $60.00 |
| 7/30/05 | RAB | .3 | $30.00 |
| 8/4/05 | CSC | .6 | $57.00 |
| 8/11/05 | RAB | .4 | $40.00 |
| 8/13/05 | RAB | .7 | $70.00 |
| 8/15/05 | RAB | .5 | $50.00 |
| 8/19/05 | RAB | .4 | $40.00 |

| Date | Timekeeper | Time Entry | Amount Disallowed |
|------|-----------|------------|-------------------|
| 8/22/05 | RAB | .7 | $70.00 |
| 8/30/05 | RAB | .9 | $90.00 |
| 9/11/05 | RAB | .3 | $30.00 |
| 9/15/05 | RAB | .4 | $40.00 |
| 9/28/05 | RAB | .5 | $50.00 |
| 10/4/05 | RAB | .2 | $20.00 |
| 11/4/05 | RAB | .2 | $20.00 |
| 12/8/05 | RAB | .3 | $30.00 |
| 12/14/05 | RAB | 1.2 | $120.00 |
| 12/16/05 | RAB | .8 | $80.00 |
| 1/3/06 | CSC | 1.2 | $114.00 |
| 1/4/06 | CSC | 1.1 | $104.50 |
| 1/10/06 | RAB | 1.1 | $110.00 |
| 4/6/06 | RAB | .2 | $20.00 |
| 4/11/06 | RAB | .7 | $70.00 |
| 4/12/06 | RAB | .8 | $80.00 |
| | | **Total Disallowed:** | $4,501.00 |

**APPENDIX F**

| Date | Timekeeper | Time Entry | Amount Disallowed |
|---|---|---|---|
| 11/30/04 | CJM | 2.0 | $150.00 |
| 1/4/05 | CJM | 2.0 | $150.00 |
| 1/21/05 | CJM | 4.3 | $322.50 |
| 1/24/05 | CJM | 2.0 | $150.00 |
| 2/9/05 | RAB | 2.0 | $200.00 |
| 2/25/05 | RAB | 1.3 | $130.00 |
| 10/14/05 | CSC | 3.5 | $332.50 |
| 10/17/05 | CSC | 2.8 | $266.00 |
| | | **Total Disallowed:** | $1,701.00 |

**SUMMARY**

|  | **Amount Disallowed** |
|---|---|
| Appendix A | $1,051.50 |
| Appendix B | $6,125.00 |
| Appendix C | $265.00 |
| Appendix D | $208.00 |
| Appendix E | $4,501.00 |
| Appendix F | $1,701.00 |
| **Total Disallowed from Appendices:** | $13,851.50 |